**William W. BAILEY; Tom Curtis; Wendell W. Wood, Plaintiffs–Appellants,**

**and**

**David D. Marshall; Michael A. Cates, Plaintiffs,**

**v.**

**J.W.K. PROPERTIES, INC., t/a Albemarle Farms, John W. Kluge, Defendants–Appellees.**

**No. 89–2318.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1989.

Decided June 6, 1990.

Before HALL and CHAPMAN, Circuit Judges, and WINTER,* Senior Circuit Judge.

PER CURIAM:

William Bailey, Tom Curtis, and Wendell Wood ("the plaintiffs") purchased interests in a cattle breeding program set up in 1985 by the defendant John Kluge through J.W.K. Properties, Inc., trading as Albemarle Farms.[1] After the program collapsed, the plaintiffs instituted this action asserting both federal claims, under federal securities laws, and pendent state law claims. The district court found that the interests purchased by the plaintiffs were not securities, so it granted summary judgment in favor of the defendants for lack of subject matter jurisdiction on the federal claims and dismissed the pendent state claims. 703 F.Supp. 478. Because we find that the interests sold by the defendants constituted securities, we reverse and remand for further proceedings on the merits of the claims.

### I.

The plaintiffs acquired interests in the Albemarle Farms cattle breeding program through two related transactions. First, the plaintiffs purchased embryos from Albemarle Farms in a "Purchase Agreement." The contract allowed the plaintiffs to select their own embryos, but in practice they relied on the expertise of the breeding program manager to select those of superior quality. Second, Albemarle Farms agreed in a separate "Management Contract" to care for the resulting calves and to market the cattle as they matured. Under the agreement, the investors retained the right to direct the care of their animals and to terminate the maintenance contract at any time.

The parties expected to reap a profit primarily through the development of a superior crossbreed of cattle, called Sim-

James Robertson, (argued) and Mindy H. Recht, Wilmer, Cutler & Pickering, Washington, D.C. and D. Michael Atkins, McClure, Callaghan, Carter & Atkins (on brief), Charlottesville, Va., for appellants.

Melvin Earl Gibson, Jr., (argued) and John K. Taggart, III (on brief), Smith, Taggart, Gibson & Albro, Charlottesville, Va., for appellees.

---

* Judge Winter participated in the hearing of this case at oral argument but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. § 46(d).

1. Two of the plaintiffs below, Michael Cates and David Marshall, also purchased interests in the program, but they did not appeal the district court judgment.

brah. The plaintiffs paid $2,500 for each embryo and could not have realized any profit by raising them and selling them for slaughter. If the crossbreeding program succeeded, however, they could sell embryos of the superior new breed at a substantial premium.

The plaintiffs purchased embryos under the program in December 1985 and left the calves to the care of Albemarle. They allege that on March 11, 1987, Albemarle "abandoned" the program because changes in the tax laws rendered it no longer profitable. The plaintiffs took possession of their herds and instituted suit against J.W.K. Properties, Inc., and its sole shareholder John Kluge. In addition to several pendent state claims, the complaint alleges inadequate disclosures in violation of the federal securities laws. The plaintiffs alleged that the court had federal question jurisdiction under 15 U.S.C. §§ 77v and 78aa and 28 U.S.C. § 1331. The defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint failed to state a claim under the federal securities laws and that the court lacked jurisdiction over the state law claims. The district judge ordered a magistrate to conduct discovery on the issue of whether the interests purchased by the plaintiffs constituted "securities" under the federal securities laws.

Under both the Securities Act of 1933 and the Securities Exchange Act of 1934,[2] a "security" includes, *inter alia,* any "investment contract." The Supreme Court set forth a three-pronged test for determining whether a plan constitutes an investment contract (and thus a "security") in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). A contract, transaction or scheme is an investment contract whenever a "person [1] invests his money [2] in a common enterprise [3] and is led to expect profits solely from the efforts of the promoter or a third party...." *Id.* at 298–99, 66 S.Ct. at 1103. Despite the restrictive language of the third prong of the test, later courts have explained that a program requiring some effort from the investor may still constitute an "investment contract," but the most essential functions or duties must be performed by others and not the investor.[3]

The magistrate found, and the parties do not contest, that the Albemarle Farms breeding program involved monetary investment in a common enterprise. Thus, the investment program satisfies the first two prongs of the *Howey* test.

The stumbling block for the plaintiffs, according to the magistrate, was that under the breeding program, the plaintiffs did not expect profits solely from the efforts of Albemarle Farms. The magistrate held that the question was not whether the plaintiffs *actually* exercised any control, but whether they had the *authority* to exercise control. As a result, the magistrate looked only to the language in the written contracts between the parties and declined to consider any of the surrounding circumstances. The two contracts gave the plaintiffs substantial rights to direct the activities of Albemarle, to choose embryos, to terminate the management agreement, and to direct the sale of the herds.[4] Even

2. Title 15 U.S.C. § 77b(1) (1982) and 15 U.S.C. § 78c(a)(2), (10) (1982), respectively.

3. The Fourth Circuit has stated that "[i]n light of the Supreme Court's statements that economic reality is to govern over form in determining what is a 'security,' we agree that the term solely—used in *Howey*—must not be given a literal construction in all circumstances." *Rivanna Trawlers Unlimited v. Thompson Trawlers,* 840 F.2d 236, 240 n. 4 (4th Cir.1988). The Ninth Circuit also adopted this broader construction of the *Howey* test in *SEC v. Glenn W. Turner Enter., Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973) (finding the third prong of the *Howey* test satisfied even though the investors had to bring in and help sell to potential purchasers). The Supreme Court noted the *Glenn Turner* interpretation without commenting on its validity in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852 n. 16, 95 S.Ct. 2051, 2060 n. 16, 44 L.Ed.2d 621 (1975).

4. For example, the "Management Contract" set forth the following rights of the purchaser or "Breeder":

(A) Breeder will have the right to direct the specific practices to be followed by Albemarle in the care, feeding, breeding and maintenance of Breeder's herd.

if the plaintiffs did not exercise any of this authority, the magistrate reasoned, its existence was enough to preclude a finding that the contracts constituted "securities." The magistrate therefore recommended granting summary judgment for the defendant for lack of subject matter jurisdiction.[5]

Plaintiffs filed an objection, but the district judge adopted the magistrate's recommendations. The plaintiffs now appeal to this Court and present a two-step argument for reversal. First, they argue that the district court applied too narrow a test in considering only the potential control theoretically available to the plaintiffs. They contend that the court should have considered the practical circumstances surrounding the transactions that limited their actual control. Second, the plaintiffs argue that an examination of surrounding circumstances shows that, at the least, a substantial factual dispute exists as to whether they could exercise any form of meaningful control. They contend that they were forced to rely on the expertise and experience of Albemarle Farms in crossbreeding cattle about which the plaintiffs contend they knew virtually nothing. As we discuss more fully below, we agree with the plaintiffs that the nature and structure of the breeding program left the essential functions and duties in the hands of the defendants. While the two contracts purport to grant the investors extensive authority over their investments, the plaintiffs were unable to exercise actual control over the breeding program itself.

## II.

One of the principal purposes underlying the federal securities laws "is to protect investors by promoting full disclosure of information necessary to informed investment decisions." *SEC v. Capital Gains*

*Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 279, 11 L.Ed.2d 237 (1963). Because it is impossible to define precisely all cases in which investors need the protection of federal disclosure laws, the definition of a security or investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103.

In *Howey*, the Supreme Court recognized that investors who have no actual control over the management of an enterprise need the "full and fair disclosure" mandated under the federal securities laws to protect their interests. The investment scheme in *Howey* involved the sale of sections of a citrus grove to individuals. The seller also offered the purchasers separate service contracts to care for and harvest the citrus crop. In finding an "investment contract," the Court emphasized that "economic reality" should take precedence over form. 328 U.S. at 298, 66 S.Ct. at 1102. Thus, the Court looked beyond the formal agreements to the fact that such small plots could not be developed economically on their own, most investors were geographically distant, and most investors actually took service contracts with the seller. These facts all indicated that the investor had little or no actual control and required the protection of the disclosure requirements of the federal securities laws. *Id.* at 299–300, 66 S.Ct. at 1103.

1. *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*

■ The district court in this case applied the *Howey* test, but excluded consideration of the surrounding circumstances in its determination of actual control. The court focused exclusively on the language

---

(B) Breeder will bear the sole responsibility for directing Albemarle to sell all or any part of his herd, or purchase additional cattle; and upon such direction, Albemarle will proceed to use its best judgment in the selection of the time, place and manner of such sales or purchase, unless otherwise directed by the Breeder.

5. Because the question of whether "securities" were involved goes to both the subject matter jurisdiction of the court and the merits of the plaintiffs' case, the court accepted jurisdiction and treated the defendants' objection as an attack on the merits. *See Rivanna Trawlers Unlimited v. Thompson Trawlers*, 840 F.2d 236, 239 (4th Cir.1988).

of the contracts because of its reading of this Court's decision in *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236 (4th Cir.1988). The district judge felt that:

> Justice Powell [in *Rivanna*] mandates a thoroughly objective inquiry. Therefore, this court must look to see simply if actual control existed. Merely because the investors chose not to exercise control or because they, perhaps culpably, misunderstood the degree of control which they in fact objectively possessed, does not serve to convert their venture to a security under the third prong of the *Howey* test.

The lower court is correct that the test of control is an objective one, but the surrounding circumstances may objectively limit the actual control possessed by the investor.

In *Rivanna*, the plaintiffs held general partnership interests in a commercial fishing enterprise. After the venture encountered difficulties, the partners were forced to replace the external manager twice and to replace the managing partner with a managing partnership committee. Eventually, a number of partners filed suit alleging violation of the federal securities laws. As with this case, the critical issue was whether the plaintiffs' interests met the third prong of the *Howey* test. The court held that the partners' interests were not investment contracts.

Writing for the court, retired Justice Powell explained that:

> A court must examine the partnership agreement and circumstances of a particular partnership to determine the reality of the contractual rights of the general partners. When, however, a partnership agreement allocates powers to the general partners that are specific and unambiguous, and when those powers are sufficient to allow the general partners to exercise ultimate control, as a majority, over the partnership and its business, then the presumption that the general partnership is not a security can only be rebutted by evidence that it is not possible for the partners to exercise those powers.

*Rivanna*, 840 F.2d at 241.

The court in *Rivanna* found that the "express powers granted to the partners are sufficient, on their face, to give them the authority to manage their investments." *Id.* at 242. However, the analysis did not end with an examination of the agreement. Justice Powell also said that investigation of the partnership agreement and circumstances of a particular partnership may show that "the partners are so dependent on a particular manager that they cannot replace him *or otherwise* exercise ultimate control." *Id.* at 240 (quoting *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)) (emphasis added in *Rivanna*).[6]

The general partners in *Rivanna*, the court held, were not so dependent that they were unable to exercise ultimate control. The court emphasized that:

> the partners not only had the authority under the agreement to manage the business, they exercised this authority and demonstrated that they were not dependent on the irreplaceable skills of others. Members of the partnership negotiated with external management groups, in-

---

**6.** While requiring an examination of the economic realities underlying formal agreements imposes a significant and demanding burden on the courts, limiting the examination to the contract itself would provide an easy loophole through which sellers could circumvent federal securities laws.

This Court has allowed a broad consideration of all the surrounding circumstances in a similar case. In *Waterman v. Alta Verde Industries, Inc.*, 643 F.Supp. 797, 804 (E.D.N.C.1986), *aff'd*, 833 F.2d 1006 (4th Cir.1987), the court held that "the court may not look solely to the language of the contract. Rather, it must consider the economic reality of the situation to determine whether the investor has any real control over the management of his investment." In *Waterman*, the defendant had sold the plaintiff cattle along with a cattle feeding agreement. Despite language permitting the investor to "actively engage" in the management of the feeding operation and the sale of the cattle, the court found that the surrounding circumstances indicated that the seller was "expected to have primary control over the purchase, feeding, care and sale of the investor's cattle." *Id.* at 804.

spected the boats on behalf of the partnership, and reviewed partnership insurance material and financial information. Significantly, on two separate occasions the external managers were replaced. Moreover, as previously mentioned, by vote of the partners, one of the promoters ... was removed as managing partner of RTU and replaced with a management committee of partners. Partners also participated in settlement discussions.

*Id.* at 242 (footnotes and citations omitted). The extensive involvement of the partners showed that they were actually able to use the management authority granted in the partnership agreement.

In reaching this conclusion, Justice Powell focused his analysis on the partners *as a group.* Because individual partners " 'have the sort of influence which generally provides them with access to important information and protection against a dependence on others[,]' " he found it unnecessary to consider whether individual partners had the knowledge or ability necessary to exercise ultimate control. *Id.* at 241 (quoting *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 650 F.Supp. 1378, 1383–84 (W.D.Va.1986)). The formal structure and protection afforded the partners under the general partnership agreement eliminated the need to apply the disclosure requirements of the federal securities laws.[7]

2. *Albemarle Farms Breeding Program*

■ The Albemarle Farms breeding program at issue in this case did not involve the formal structure and protection of a general partnership. Rather it involved two distinct contracts covering the purchase of cattle embryos and the maintenance of the herds. In addition, the parties contemplated that Albemarle Farms would use its skill and expertise to develop a superior crossbreed of cattle through the selection of embryos and culling of the resulting calves. While the breeding program would be most successful if Albemarle Farms coordinated the efforts of the individual investors, the record contains no formal agreement concerning the allocation of rights and responsibilities between investors.[8] Without the protections of a general partnership relied upon by the court in *Rivanna*, we find it appropriate to examine the ability of each individual investor to exercise ultimate control over the common enterprise.

We agree with the district court that the plaintiffs had the *authority* to exercise some control over their individual investments. They could choose the embryos they wished to purchase and direct the feeding practices and marketing of their cattle or terminate the management agreement with Albemarle Farms. When viewed in light of the surrounding circumstances, however, the plaintiffs had little to no control over the ultimate success or failure of their investments.

If the investment scheme had been merely to raise cattle for slaughter, the interests purchased by the plaintiffs may not have constituted investment contracts. The plaintiffs had the practical ability to exercise control over the raising and sale of their cattle. All were sophisticated businessmen and lived near Albemarle. Even if the plaintiffs had no direct knowledge of or experience with raising and selling cattle, they could have hired others to care for

---

7. In addition to the terms of the partnership agreement, Virginia law provided the partners with a number of important rights guaranteeing control and access to information. *Rivanna*, 840 F.2d at 242 n. 8. *Cf. Marine Bank v. Weaver*, 455 U.S. 551, 558–59, 102 S.Ct. 1220, 1224–25, 71 L.Ed.2d 409 (1982) (finding that an agreement with a bank did not constitute an investment contract where the bank was heavily regulated by the government and the investor's return on the certificate of deposit was virtually certain).

8. The written contracts cover only the selection of embryos and maintenance of the cattle for each individual investor without delineating the coordination between investors. For example, nothing in the record indicates that Albemarle Farms or the other investors were obligated to sell any particular embryos to the other participants. The only party able to exercise centralized control was Albemarle Farms, which could use its experience and expertise to coordinate the individual herds into a cohesive breeding program.

the cattle and, unlike the citrus grove in *Howey*, cattle are easily moved.[9] The existence of readily available alternatives made the plaintiffs less dependent on Albemarle and suggests that this aspect of the program by itself may not constitute an "investment contract."[10]

However, the Albemarle Farms program also involved the selection of embryos and crossbreeding. The plaintiffs had no expertise in making such selections and had an extremely limited range of alternative sources of such information.[11] Albemarle had the ability to use its " 'special expertise to select items within a particular class of items which will appreciate at a faster rate than will the particular class in general....' " *Waterman*, 643 F.Supp. at 804 (quoting Long, *Blue Sky Law*, § 2.03[2][d][iii] pp. 2–45 and 2–46).[12] That expertise made the plaintiffs practically dependent on Albemarle Farms despite language in the contract giving them theoretical control.[13]

In addition to their inexperience in cattle breeding, we find another practical limitation on the ability of the plaintiffs to exercise control over the common enterprise. Even if the plaintiffs had the knowledge necessary to run a crossbreeding program, the Albemarle Farms breeding program involved an interdependence present in *Howey*, but absent in *Rivanna*. The Court in *Howey* noted that the small plots in the citrus grove would be too small to develop alone. The program required the participation of other investors with coordination by one entity (*i.e.*, the seller) to maintain the grove. 328 U.S. at 300, 66 S.Ct. at 1103. In this case, no single investor owned enough cattle to run a meaningful breeding program. The program required the investors to pool their herds and coordinate the selection and culling process.[14]

---

**9.** Plaintiff Wood exercised his control over this aspect of the program by removing the cattle to his farm prior to the alleged abandonment of the breeding program by Albemarle Farms.

**10.** While this case only presents the issue of a cattle *breeding* program, we note that some courts have held that cattle maintenance and marketing programs may constitute investment contracts, even though the investor retained some rights in the language of the contract. *See, e.g., Waterman*, 643 F.Supp. 797 (E.D.N.C. 1986), *aff'd mem.*, 833 F.2d 1006 (4th Cir.1987) (finding a cattle feeding program constituted an investment contract); *Barry v. Ceres Land Co.*, [1982–1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,008, 1978 WL 960 (D.Minn. July 26, 1978) (cattle program an investment contract despite investors' right to terminate and remove cattle).

**11.** The plaintiffs' statement that they would have to go to Texas to find another similar breeding program suggests that they would not be able to replace Albemarle Farms within reasonable limits. *Cf. Rivanna*, 840 F.2d at 240 n. 5.

**12.** The parties disputed whether the plaintiffs had the right to remove the "manager" of the program. Albemarle Farms replaced the man running the program without consulting the plaintiffs. The plaintiffs contend that this shows lack of control over management. Defendants argue that the "manager" was Albemarle Farms and the man they replaced was merely an employee of the "manager." The plaintiffs, they assert, had the right to terminate their contracts with Albemarle Farms at any time.

We find it unnecessary to decide this issue. Whether or not the plaintiffs had the authority to select the "manager," they would not have known whom to choose. They were dependent on Albemarle Farms to make such decisions. *Cf. Gordon v. Terry*, 684 F.2d 736, 742–43 (11th Cir.1982) (The court suggested that an investment contract might exist where a real estate partnership's manager had some unique understanding of the real estate market in the area in which the partnership invested.).

**13.** While the plaintiffs were sophisticated businessmen, they had no experience or expertise in cattle breeding. The Fifth Circuit has held that the investor's knowledge must be "tied to the nature of the underlying venture." *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 134 n. 3 (5th Cir.1989) (pointing out that *Howey* required specialized knowledge pertinent to the business venture and holding that the knowledge cannot come from the promoter). While generalized business experience may enable an individual to choose a suitable place to keep cattle, it does not prepare one to run a cattle breeding program.

**14.** As discussed above, the record does not indicate that Albemarle Farms or the other investors in the program were obligated to sell the plaintiffs any particular embryos. This right would be important if continuation of the breeding program required the investor to crossbreed his cattle with those of others in the program.

Albemarle provided that guidance in a fashion similar to the coordination provided by the seller in *Howey*.[15] By contrast, the general partnership (viewed as a group) in *Rivanna* was fully capable of undertaking commercial fishing operations on its own. *Rivanna*, 840 F.2d at 242 n. 9.[16]

The plaintiffs' reliance on Albemarle Farms was not "the mere choice by a partner to remain passive." *Id.* at 240–41. Rather, the circumstances were such that they could not have meaningfully exercised the rights theoretically available to them.

### III.

■ The district court improperly limited its examination under the *Howey* test to the language in the contracts. It should have considered the practical limitations faced by the plaintiffs given their lack of expertise and experience in this area and the need for coordination between investors. In light of these limitations, we find that the Albemarle Farms breeding program constituted an investment contract. We reverse the grant of summary judgment for the defendants on the federal claims and the dismissal of the pendent state law claims by the district court and remand the case for further proceedings.

REVERSED AND REMANDED.

15. We note that the breeding program fell apart immediately after Albemarle Farms ceased its participation. While not dispositive, this observation does reinforce our conclusion that Albemarle Farms, and not the plaintiffs, maintained actual control over the breeding program.

16. *Cf. Faircloth v. Jackie Fine Arts, Inc.*, 682 F.Supp. 837, 844–45 (D.S.C.1988) (In distinguishing *Howey*, the court noted that "[t]he key difference between that case and this case is the extent to which the individual investments were intertwined.").