27 F.3d 563
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PAMACO PARTNERSHIP MANAGEMENT CORPORATION, Plaintiff-Appellant,
v.
Joseph ENNING, Defendant-Appellee.
PAMACO PARTNERSHIP MANAGEMENT CORPORATION, Plaintiff-Appellee,
Joseph ENNING, Defendant-Appellant.
 Nos. 93-1858, 93-1925.
 United States Court of Appeals, Fourth Circuit.
 Argued: February 7, 1994.
Decided: June 22, 1994.
 
 Appeals from the United States District Court for the Western District of Virginia, at Charlottesville. James H. Michael, Jr., District Judge. (CA-90-33-C).
 Argued: Craig T. Redinger, Slaughter & Redinger, P.C., Charlottesville, VA, for appellant.
 David Homer Pettit, Feil, Deinlein, Pettit & Williams, P.L.C., Charlottesville, VA, for appellee.
 On brief: David B. Franzen, Feil, Deinlein, Pettit & Williams, P.L.C., Charlottesville, VA, for appellee.
 W.D.Va.
 AFFIRMED.
 Before RUSSELL and MICHAEL, Circuit Judges, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 MICHAEL, Circuit Judge:
 
 I. Introduction
 
 1
 On August 1, 1990, Pamaco Partnership Management Corporation (Pamaco) sued Joseph Enning individually and as a director, officer and majority shareholder of Hot Springs Autowash Corporation of America (HSA). Pamaco asserted the following claims: (1) violations of Section 10(b) of the Securities and Exchange Act of 1934 (the 1934 Act) and Rule 10b-5, (2) aiding and abetting, (3) breach of contract, (4) fraud and constructive fraud, (5) breach of fiduciary duty, and (6) breach of the duty of good faith and fair dealing.
 
 
 2
 Pamaco sued as the corporate general partner of eight limited partnerships formed to raise money to build a string of car washes that HSA managed. In part, Pamaco claims it and the eight limited partnerships lost money because Enning and HSA fraudulently misrepresented their expertise in the car wash business and engaged in self dealing. HSA went bankrupt in 1989. Pamaco's 1934 Act claims and federal jurisdiction are bottomed on its assertion that the partnerships' interests in certain car washes, as evidenced by several written agreements, were "securities" within the meaning of the 1934 Act.
 
 
 3
 Specifically, Pamaco argues that the partnerships' interests satisfy the three-pronged test for an "investment contract" set forth in SEC v. W.J. Howey Co., 328 U.S. 293 (1946).
 
 
 4
 Enning filed a motion to dismiss (1) for lack of subject matter jurisdiction, (2) for failure to bring the action in the name of the real party in interest, and (3) for failure to state a claim.
 
 
 5
 Early in the action, the district court ordered discovery limited to the question whether subject matter jurisdiction existed. Later, under 28 U.S.C. Sec. 636(b)(1)(B), the district court referred the action to the magistrate judge for "recommendations for the disposition of this case." JA114. After about a year of discovery, Pamaco filed a motion for partial summary judgment. On July 29, 1992, the magistrate judge filed a report and recommendation in which he recommended that Enning's motion to dismiss for lack of subject matter jurisdiction be converted to a motion for summary judgment and granted. On June 9, 1993, the district court adopted the report and recommendation in its entirety. In its final order, the district court granted Enning summary judgment on Pamaco's federal securities law claims and dismissed Pamaco's state law claims without prejudice.
 
 
 6
 Pamaco appeals, and Enning cross appeals, the district court's order. Pamaco asserts that the court did not apply the proper summary judgment standards in concluding that the governing agreements were not "securities" within the meaning of the 1934 Act. In his cross appeal, Enning challenges the district court's determination (1) that the second (common enterprise) prong of the Howey test is satisfied, and (2) that the proper party plaintiff is before the court.
 
 
 7
 The parties seem to agree with the magistrate judge's characterization of the key issue: "The debate, as the parties draw it, centers on whether Pamaco, [by itself and] through[its president] Wiethoff, exercised so much control over the construction, equipping, and operation of the car washes that the investment scheme fails ... [the] third prong[ ] of the Howey test." JA271. We conclude that no security is present here because the third prong of Howey cannot be met. We therefore affirm. Given this disposition, we need not reach the issues raised in Enning's cross appeal.
 
 II. Background
 
 8
 Pamaco's president and sole owner, Hans J. Wiethoff, is a German investment banker and stockbroker. One of Wiethoff's investment companies was engaged in financing and supervising entrepreneurial ventures. Joseph Enning is a German engineer who developed an innovative car washing method known as the Touchless (TM) System, which uses no brushes. He established a string of car washes in Germany through his company, Mr. Wash Auto Services, AG, Duesseldorf. In the late 1970s, Enning decided to expand to the United States and formed German Autowash, which later became HSA. Among other car wash facilities, HSA developed and managed Hot Springs North Carolina, Inc. (HSNC) in Charlotte.
 
 
 9
 Before HSNC got off the ground, Enning contacted Wiethoff. Enning told Wiethoff of his interest in launching the luxury car wash chain and suggested Wiethoff invest in HSNC. Wiethoff agreed, and in 1981 he solicited other investors for the venture. Wiethoff's group eventually became the largest single investor in HSNC, purchasing 38% of its stock. In 1985, a dispute arose between Wiethoff and Enning over HSA's management of HSNC. A settlement was reached quickly, however, pursuant to which HSA's stock in HSNC was canceled and Wiethoff became president of HSNC.
 
 
 10
 After HSNC achieved some success, Wiethoff and Enning agreed in 1985 to develop a string of car washes. They contracted through a "Basic Agreement." Among other things, the agreement gave Wiethoff the exclusive right to raise investment capital in Europe for additional car washes and provided that "the operation of the car wash facilities will be taken over by HSA through a management contract." JA28. In accordance with the Basic Agreement, Wiethoff formed eight Virginia limited partnerships (collectively the "partnerships" and individually as "HSP ________") between 1986 and 1988 to raise the capital to develop the wash facilities. A separate limited partnership was formed for each car wash, except for HSP 8 which developed two facilities.[1] Pamaco was formed to act as corporate general partner, with Wiethoff as individual general partner, for each of the partnerships. To repeat, Wiethoff was the sole owner and president of Pamaco. Once each limited partnership was formed, through Pamaco it entered Facility Agreements and Management Agreements with HSA for each site and facility. The Facility Agreements governed site acquisition and the Management Agreements dealt with management of the washes. With the exception of HSP 2, each partnership also entered an Escrow Agreement to govern the disbursement of funds for site and equipment acquisition and facility construction.
 
 A. The Facility Agreements
 
 11
 The Facility Agreements gave the partnerships a measure of control over the sites chosen for the new car wash facilities. For instance, HSA was prohibited from paying more than $285,000 for any site absent written approval from the partnerships. Although the partnerships were not required to consent to the particular site purchased, they reserved the right to terminate purchase agreements with the seller upon certain specified conditions, e.g., if the results of soil tests were unsatisfactory. The partnerships also mandated (1) that the seller convey good and marketable title to the land, (2) that HSA secure a title insurance policy in the particular partnership's name, and (3) that HSA assure the site was zoned to allow construction of a car wash.
 
 
 12
 The Facility Agreements also contained a section relating to construction and installation of the car wash facilities. They included two schedules which mandated what the facility would look like. The schedules described each structure and its equipment in detail, down to window washing fixtures and acid resistant gratings. The total cost was capped at $1.5 million.
 
 B. The Management Agreements
 
 13
 Depending on the facility, the Management Agreements spanned between 10 to 15 years and provided that HSA was "employed" to perform the management services outlined. Employees at the facilities were to be employees of Pamaco and not of HSA. HSA was directed to purchase necessary insurance on the facilities, pay necessary taxes, arrange for utility hookups, and perform other duties "as [HSA] deem[ed] necessary or desirable for the proper and efficient management ... of the Facility." JA93-94. The partnerships were bound to pay all operating costs under the Agreements. For instance, they were to pay or reimburse HSA for (1) out-of-pocket costs of HSA managers, (2) advertising expenses, (3) hiring and training expenses, (4)legal, accounting or other professional expenses, and (5)" [a]ny other out-of-pocket expenses incurred by HSA in connection with the Facilit[ies]." JA97-98.
 
 
 14
 The Management Agreements also required HSA to report financial information regularly to the partnerships. HSA had to prepare and submit budgets, financial statements and balance sheets to the partnerships annually, and HSA was to "use its best efforts to operate and manage the Facilit[ies] within ... [the submitted] budget...." JA98. HSA was also required to prepare and submit monthly statements of the facilities' receipts, expenditures and sales statistics. The partnerships were entitled to "have access to all records, books of account and other documents in the possession or under the control of HSA in respect of the Facilit[ies]...." JA100.
 
 
 15
 The Management Agreements imposed detailed procedures for handling income. They required the daily deposit of all receipts into special operating accounts (on which HSA had signature authority) in the relevant partnership's name. HSA could retain in the accounts monies necessary for working capital and certain costs, but the remaining balance every month was remitted to the partnerships.
 
 C. The Escrow Agreements
 
 16
 Under the Escrow Agreements the bank "disburse[d] the funds required to purchase the Site and the Equipment to be installed at the Facility in accordance with written instructions sent to [the bank] by an officer of Pamaco ...."[2] Escrow Agmt. at 3 (emphasis added) (hereinafter "EA at "). The approval of the partnership and its designated architect was required for the disbursement of construction funds. To the extent they were inconsistent with the terms of the Facility and Management Agreements, the Escrow Agreements controlled.
 
 
 17
 D. Wiethoff's and Pamaco's Involvement in the Enterprise
 
 
 18
 Wiethoff's undisputed deposition testimony[3] and its accompanying exhibits show that he and Pamaco, on behalf of the partnerships, participated significantly in the affairs of the enterprise even though HSA held the management contracts.[4]
 
 
 19
 First, Wiethoff and Pamaco were involved in the construction, renovation and planning of the facilities:
 
 
 20
 . Wiethoff visited car wash sites both before and after they were purchased.
 
 
 21
 . The partnerships designated architects to certify that the proposed buildings were in accord with plans and specifications.
 
 
 22
 . Wiethoff claimed to have no input into the design of the car washes, but admitted he had an architect in Germany make sketches of what he thought would be a "beautiful car wash building." Deposition of Hans J. Wiethoff at 172 (hereinafter "WD at ________"). The sketches were then sent to Enning, but not used.
 
 
 23
 . Wiethoff requested and received, allegedly for purposes of the prospectus, copies of building permits and rezoning information as early as 1986.
 
 
 24
 . In May 1986, Wiethoff requested and received floor plans for a design concept at one of the car washes.
 
 
 25
 . In November 1988, a North Carolina Department of Commerce official wrote Wiethoff and said "I was delighted to learn of your great success with ... [the] auto wash locations.... I was also pleased to learn that you are looking for a second and possibly, a third location in the Charlotte area." EX190 (emphasis added).
 
 
 26
 . In January 1989, Wiethoff received a letter from HSA's director of finance requesting approval, via a signature block for Wiethoff, to spend $6,000 to install detail service bays at all the facilities. Wiethoff testified, "I rejected this and I never signed it." WD at 416.
 
 
 27
 . In August 1989, Wiethoff approved a detail room addition, except for a skylight, for installation at HSP 9.
 
 
 28
 Second, Wiethoff was involved in advertising, marketing, and pricing:
 
 
 29
 . Wiethoff suggested advertising strategies such as a billboard for the Louisville HSP, which was eventually obtained. . Wiethoff testified, "So, it was in fall '88 that I met [an HSA official] and I said I would like, because he was in the States, I would like to consult a marketing company, what they would think about marketing a car wash, pricing, advertising, and so on...." WD at 99. In the Spring of 1989, Wiethoff met to discuss ideas with officials of the marketing agency selected.
 
 
 30
 Third, Wiethoff regularly received very detailed financial information about the enterprise:
 
 
 31
 . On a month-to-month basis, Wiethoff received extensive financial information on the car washes. He also received annual audited information. In addition, he often received weekly statistics that included details such as the number of cars washed. Wiethoff said he reviewed these in depth, often performing comparative analyses between the individual car washes. For instance, he commented that in studying the 1987 or 1988 statements he found that there was a "tremendous amount of trouble cost[s] and maintenance and repair costs...." WD at 108.
 
 
 32
 . Wiethoff also received budgets, but complained they were insufficient. As a result, he had the president of his management company prepare forecasts on a month-to-month basis.
 
 
 33
 Fourth, Wiethoff was either aware of or asked for information about many of the day-to-day operational aspects of the facilities. Pamaco and Wiethoff repeatedly gave directions or suggestions to HSA:
 
 
 34
 . Wiethoff believed HSA should inform him if it intended to make any deviations from the original management plan.
 
 
 35
 . In November 1987, a letter from HSA's director of finance notes that Wiethoff had "authorized Peat, Marwick, Main & Co. to do the 1986 audit work while doing the 1987 audit." EX181.
 
 
 36
 . In April 1988, Wiethoff wrote to a Pamaco official and said he had been recently informed of the firing of the manager of HSP 3. Wiethoff continued, "In [the] future I would ask you to inform me if there is a change in managers." EX215. Wiethoff explained that he wrote this letter, in part, because the partnership was paying the salaries and "from [a] control point of view, it is important to know at least the key personnel." WD at 447.
 
 
 37
 . In August 1988, Pamaco objected to a preventative maintenance program proposed by the director of finance of HSA to save on costs. Wiethoff suggested, among other things, the measure would actually increase operating expenses.
 
 
 38
 . In November 1988, Pamaco recommended the following to HSA's director of finance: "[W]ithhold part of the architect's payment in [the] future to get their attention. Also, the requirement to deliver negatives together with pictures should be included in their contract." EX188.
 
 
 39
 . In 1989, Wiethoff visited some of the car washes and asked questions about the method of vacuum cleaning. Wiethoff agreed with the approach at the time, but later changed his mind.
 
 
 40
 . Pamaco directed HSA in an April 1989 letter to consult with Pamaco "before the purchase of new capital items having a value of $500 or more...." EX118.
 
 
 41
 . Wiethoff stated in a July 1989 letter that he had been in the United States almost every month since the previous Fall in order to (1) inform himself personally as general partner, (2) check on the investments arranged by 6350 35 3 Enning and HSA, and (3) analyze the results. Wiethoff admitted he pursued the car wash business in the United States with great interest between 1981 and 1985. He also said:
 
 
 42
 I look with interest to--great interest to the car wash business and from '86 on I inform myself and then I pointed out that I participated in all ICA car wash meetings, precisely what I told you already. And then that in 1989 I spent approximately one third of my time there and ... that I have to control and to analyze what we got, this was a reason to spend here one third of my time, to control and to analyze what Dr. Enning sold us.
 
 
 43
 WD at 344 (emphasis added).
 
 
 44
 . HSA's management fees were tied to the level of success of each of the car washes. While HSA never earned a management fee due to the poor performance of the car washes, counsel conceded at argument below that Pamaco was always paid the $1,500 it was due under the Basic Agreement as compensation for the business expenses of the partnerships. The Management Agreement, however, provided for payment of the $1,500 only after HSA received management fees.
 
 
 45
 Fifth, Wiethoff and Pamaco had experience and expertise in the car wash business:
 
 
 46
 . In February 1985, Wiethoff inquired of Enning about a revenue analysis Wiethoff had received and requested an explanation as to why damage costs had increased during a certain period.
 
 
 47
 . In March 1985, Wiethoff requested an explanation of deviations in projected and actual operating expenses at two car wash facilities. . In June 1985, Wiethoff requested an explanation of an increase in operating expenses of 53.7%.
 
 
 48
 . Wiethoff became president of his own car wash (HSNC) in approximately 1985. He claims, however, that he was not involved in the management of the facility.
 
 
 49
 . As early as June 1985 Wiethoff suggested to Enning certain advertising strategies at HSNC, e.g., that a stronger television campaign should be looked into because of falling numbers.
 
 
 50
 . In August 1985, Wiethoff asked why there was a 15% decrease in washes during July. He also inquired whether there had been a survey performed to gauge customer satisfaction.
 
 
 51
 . Wiethoff questioned Enning about pricing policies at HSNC, but was rebuffed.
 
 
 52
 . Wiethoff, as early as 1986, began attending car wash trade shows. He regularly attended these semi-annual meetings.
 
 
 53
 . Wiethoff subscribed to various industry publications. He listed, for instance, Ultra Laundry, Professional Car Washing, and American Clean Car.
 
 
 54
 . Wiethoff performed a "step-by-step" costing of the equipment used in the facilities.
 
 
 55
 . In 1986, Wiethoff spoke of his experience in the car wash industry starting with HSNC. Deposition of Reinhard E. Kiesler at 164-65(II).
 
 
 56
 . In June 1987, Wiethoff asked about making changes to HSNC, including the addition of entrances and vacuuming at those entrances. He included a hand drawn sketch and a modified photograph of what he believed was the appropriate design. . In August 1987, Pamaco was issued a certificate of authority, signed by Wiethoff, to transact business in Kentucky. The certificate stated that Pamaco intended to transact business by the "investment in, operation, and management of auto wash facilities." EX175 (emphasis added).
 
 
 57
 . In a 1988 letter to Wiethoff, an individual associated with a German investor wrote that he and others were pleased that Wiethoff had repeatedly talked with Enning and his colleagues concerning the kind and extent of marketing, public relations, and advertising for HSNC.
 
 
 58
 . Wiethoff said that, in most cases, he would be informed of events such as the firing of an HSNC manager.
 
 
 59
 . In April 1989, Pamaco demanded to be consulted "before changes of the wash process" were instituted and expressed concern over possible modifications to the cleaning agents being used. EX118.
 
 
 60
 . In a May 1989 letter to Enning, Wiethoff said his (Wiethoff's) management philosophy on auto detailing hit the bull's eye while Enning's approach was not quite right. Earlier that year, Wiethoff suggested to an HSA official that detailing be investigated for use at HSP 2.
 
 
 61
 . In a June 1989 letter, a contracting service sent a letter to Pamaco detailing design changes to HSNC requested by Wiethoff. Wiethoff appears to have provided the contractor with detailed drawings and specifications to facilitate the changes. Wiethoff's signature at the bottom of the page indicates he accepted the proposed offer to perform the work.
 
 
 62
 . The facilities manager sent an October 1989 memo to Wiethoff about highly technical changes to the wash system. For instance, it even included details about cash register modification.
 
 E. HSA's Bankruptcy; Subsequent Operations
 
 63
 The car wash enterprise experienced financial difficulties. In approximately January 1989, Wiethoff formed Hot Springs Associates, Inc. (HSAI). Wiethoff said he formed HSAI in the event HSA became unavailable to manage the car washes. That contingency occurred in November 1989 when HSA filed for bankruptcy. Shortly thereafter, Wiethoff, through HSAI, undertook management of the wash facilities held by the HSPs. Wiethoff testified that since May 1990, he has been "deeply involved" in the management of the car washes. WD at 122. He says the car washes are "definitely" better managed now than when HSA was involved. WD at 130. In fact, Wiethoff said that HSAI is even capable of taking on car wash management for other wash owners.
 
 III. Standard of Review
 
 64
 The parties disagree about whether the magistrate judge was permitted to engage in fact finding. Enning argues that when lack of subject matter jurisdiction is raised the court must make findings of jurisdictional facts. Pamaco argues that when a challenge to jurisdiction is simultaneously a challenge to the existence of a federal claim, the court must accept jurisdiction and deal with the challenge as an attack on the merits.
 
 
 65
 The magistrate judge converted Enning's motion to dismiss to a motion for summary judgment and then used standard summary judgment law to recommend disposition. We approved of this approach in Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc., 840 F.2d 236, 239 (4th Cir.1988):
 
 
 66
 The Supreme Court has held that when the contested basis for jurisdiction is also an element of the plaintiff's federal claim, the claim should not be dismissed for lack of subject matter jurisdiction. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). When the claim is neither immaterial nor insubstantial, the proper course of action is for the district court to accept jurisdiction and address the objection as an attack on the merits. Id. Whether a particular interest is a "security" is both a question of subject matter jurisdiction and an element of appellants' asserted claims under the federal securities laws.... Despite its technically incorrect statement that "the case must be dismissed for want of jurisdiction," the court considered the security issue as though it were the basis of a motion to dismiss for failure to state a claim that had been converted into a motion for summary judgment. Therefore, we hold that the district court properly accepted jurisdiction over these claims and considered them on the merits.
 
 
 67
 On appeal, we also treat Enning's jurisdictional attack as one on the merits and, like the magistrate judge, inquire whether summary judgment is appropriate. We review the district court's ruling, which adopted the magistrate judge's report and recommendation, de novo.
 
 
 68
 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. Id. at 255. The party seeking summary judgment has the initial burden to show the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The opposing party must then demonstrate by specific facts that a triable issue exists; it may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. Id. at 252.[5]
 
 IV. Applying the Howey Test to this Case
 
 69
 Under the 1934 Act, a "security" includes an "investment contract." 15 U.S.C. Sec. 78c(a)(10). In Howey, the Supreme Court established a three-pronged test to determine if an arrangement constitutes an investment contract (and thus a security). Howey, 328 U.S. at 298-99. An investment contract exists when a "person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.... " Id. "Despite the restrictive language [by use of the word 'solely'] of the third prong of the test, later courts have explained that a program requiring some effort from the investor may still constitute an'investment contract,' but the most essential functions or duties must be performed by others and not the investor." Bailey v. J.W.K. Properties, Inc., 904 F.2d 918, 920 (4th Cir.1990). Whether a particular investment is a security depends upon the facts and circumstances of the case. Maritan v. Birmingham Properties, 875 F.2d 1451, 1457 (10th Cir.1989) ("In short, each case must be analyzed on its own facts ..."). Substance is exalted over form and emphasis is placed on economic reality. Tcherepnin v. Knight, 389 U.S. 332, 336 (1967).
 
 
 70
 Our issue is whether the car wash venture here fails the third prong of the Howey test. Our Bailey opinion provides guidance about the inquiry required under the third prong. In this inquiry, we first review the agreements to determine whether the investors have the authority to exercise some control over their investment. Second, we determine (a) whether they have the practical ability (i.e., the sophistication and expertise) to exercise control over the ultimate success or failure of their investment and (b) whether, in fact, they exercised control. Bailey, 904 F.2d at 923-24.
 
 
 71
 The several agreements here clearly provided the investing partnerships with the authority to exercise control over the venture. For example, in the Facility Agreements the partnerships (1) placed a cap on site selection costs which could be exceeded only with the written approval of the partnerships, (2) reserved the right to cancel site purchase agreements in certain circumstances, (3) mandated in detail the style, structure and equipment for each wash facility, and (4) placed a cap on construction and equipment costs. Under the Management Agreements, the employees of the individual car washes were the employees of Pamaco and not HSA, the partnerships had to pay all operating costs, detailed procedures were specified for handling money, and HSA had to submit budgets and provide regular and detailed financial information to the partnerships. Pamaco also had the authority to terminate the Management Agreements after a specified time. Under the Escrow Agreements, the bank could disburse funds for site and equipment acquisition only on instructions from an officer of Pamaco. Further, construction funds could be disbursed only with approval of the partnership and its designated architect.
 
 
 72
 Pamaco, by itself and through Wiethoff, also had the practical ability to exercise control over the car wash enterprise. While no one admission by Wiethoff is decisive, we are convinced that Pamaco was capable of, and did through Wiethoff, exercise the powers available to (or assumed by) it and the partnerships.
 
 
 73
 A reading of Wiethoff's own words in his deposition leads to the inescapable conclusion that he had considerable knowledge and expertise in the car wash business. Five years before the venture at issue began, Wiethoff's group invested with Enning in the HSNC facility in Charlotte. At HSNC, Wiethoff suggested such things as pricing changes, advertising strategy and facility design changes. He became president of HSNC in 1985.
 
 
 74
 Wiethoff attended industry trade shows and subscribed to and reviewed industry publications. He submitted sketches to Enning proposing a design for a car wash building and regularly visited car wash sites. Wiethoff questioned Enning about advertising and marketing and even told Enning that his (Wiethoff's) management philosophy on a major aspect of the car wash business was superior to Enning's.
 
 
 75
 Wiethoff also received, in accordance with the Management Agreements, substantial and detailed financial information about the car washes. His testimony and letters reveal that he was able to recognize problems and demand explanations from Enning. When information was inadequate, Wiethoff would request further material or direct others to prepare analyses.[6] The record is replete with examples of how Wiethoff and Pamaco asserted control over the enterprise, including the following: (1) the approval of facility additions; (2) the recommendation to withhold part of an architect's fee; (3) the demand for consultation prior to HSA's purchase of capital items over $500; (4) the suggestion of advertising strategies and the discussion of ideas with a marketing firm; (5) the authorization of audits by a particular firm; (6) the demand to be informed about changes in facilities managers; and (7)the objection to a cost saving measure and the suggestion it would actually increase operating expenses. Also telling is that while HSA never received a single management fee, Pamaco was always paid the $1,500 it was due under the Basic Agreement. This was the practice, even though the agreement provided that HSA had to be paid first.
 
 
 76
 After considering the agreements themselves, Wiethoff's admissions in his deposition testimony, and his deposition exhibits, we conclude that a reasonable jury could not find the facts necessary to support a conclusion that the third prong of Howey is satisfied. Wiethoff and Pamaco interjected themselves to the point of exercising considerable control over the enterprise. As a matter of law, then, the agreements are not securities under the 1934 Act and the district court was correct to award summary judgment to Enning on that issue.
 
 V. Conclusion
 
 77
 The judgment of the district court is affirmed.
 
 
 78
 AFFIRMED.
 
 
 
 [1]
 Exhibit 33 to Wiethoff's deposition, which was prepared at Wiethoff's direction, sets forth the structure of one of these partnerships. The partnership objectives are listed as the purchase, financing, development, construction, operation, or leasing of a car wash facility. (Wiethoff deposition exhibits are hereinafter referred to as "EX ________ ".)
 
 
 [2]
 As noted above, HSP 2 did not have an Escrow Agreement. Rather, HSA advanced sums for construction and installation and HSP 2 made payments against invoices rendered by HSA
 
 
 [3]
 None of Wiethoff's deposition testimony was included in the appendix, even though it was relied upon by the judges below. As a result, it was necessary for us to obtain the deposition from the district court. We remind counsel that, under our Local Rule 10, the district court retains the record in most cases, and we see only the appendix. For that reason, it is both required and necessary that counsel prepare an adequate appendix. See Fed. R.App. Proc. 30; I.O.P.-30.2
 
 
 [4]
 Even though Pamaco would have us disregard its effect, Virginia partnership law clearly applies in this case and must be considered. We agree with the magistrate judge's conclusion that Wiethoff's knowledge and actions are attributable to both Pamaco and the partnerships. Both general partnership law and Va.Code Ann. Sec. 50-12 (Michie 1989) provide that the knowledge of general partners is imputed to the partnership and its members. Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc., 650 F.Supp. 1378, 1386 (W.D.Va.1986), aff'd, 840 F.2d 236 (4th Cir.1988). Further, since every partner is an agent of the partnership, "the act of every partner ... for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership." Va.Code Ann. Sec. 50-9(1); see Green v. Foley, 856 F.2d 660, 666 (4th Cir.1988), cert. denied, 490 U.S. 1031 (1989); Holloway v. Smith, 88 S.E.2d 909, 915 (Va.1955). As apparently conceded below by Pamaco, the fact that the HSPs were limited partnerships does not alter this analysis. Va.Code Ann. Sec. 50-6(2)
 
 
 [5]
 Pamaco contends that the magistrate judge engaged in impermissible factfinding. We need not reach this issue because we decide this appeal on our review of the agreements themselves and the deposition testimony (and accompanying exhibits) of plaintiff Pamaco's president, sole owner and partner, Wiethoff
 
 
 [6]
 Wiethoff's (and Pamaco's) expertise is confirmed by the fact that the car wash enterprise survived the HSA bankruptcy after Wiethoff formed HSAI to manage the washes. As indicated above, Wiethoff admits to his "deep involvement" with HSAI and says that the car washes are "definitely" better managed now than they were under HSA. WD at 122, 130. The ability of the car washes to survive after HSA's and Enning's departure also aids us in determining that Wiethoff and Pamaco exercised control over the enterprise. Bailey, 904 F.2d at 925 n. 15 (investment program fell apart after the promoter's abandonment of the program; "[w]hile not dispositive, this ... does reinforce our conclusion that [the promoter], and not the [investors], maintained actual control over the [investment] program")