**Robert JACKSON, Plaintiff,**

v.

**SERVICE ENGINEERING, INC., Defendant.**

**No. IP 99–136–C H/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

March 17, 2000.

Denise K. LaRue, Haskin Lauter Cohen & LaRue, Indianapolis, IN, for plaintiff, Robert Jackson.

James A.L. Buddenbaum, Robert J. Donahue, Parr Richey Obremsky & Morton, Indianapolis, IN, for defendant, Service Engineering.

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

This case highlights the pressures that can be placed on an employer, an employee, and his family when the family's health insurance is tied to employment (especially with a modest-sized employer), and a member of the family then suffers from a very expensive medical problem. Plaintiff Robert Jackson worked for defendant Service Engineering, Inc. for fourteen years. Jackson's wife Marcella suffered from liver disease. She was told in early 1995 that she needed a liver transplant. Under an employee benefit plan, Service Engineering paid most of its employees' and their families' health care costs but had a "stop-loss" insurance policy to pay for high cost care. After Mrs. Jackson was told she needed a liver transplant, however, Service Engineering's stop-loss insurance carrier sharply raised the deductible for only Mrs. Jackson. The carrier began requiring the company to pay the first $100,000 of costs each year for caring for Mrs. Jackson. Service Engineering paid those costs, and Mrs. Jackson received her liver transplant in June 1996, which was successful. Service Engineering fired Jackson on November 3, 1997, which had the effect of removing both the Jacksons from its health insurance policy.

Jackson has sued Service Engineering for violating the Employees Retirement Income Security Act (ERISA) by firing him for exercising his and his wife's rights under an employee benefit plan, see 29 U.S.C. § 1140, and for violating the Americans with Disabilities Act (ADA) by discriminating against him because of his "association" with a person with a record as an individual with a disability, see 42 U.S.C. § 12112(b)(4).

Service Engineering has moved for summary judgment on both claims. Jackson has responded. The papers on this motion provide a good example of a "paper trial." Pursuant to this court's Local Rule 56.1, Service Engineering identified 185 assertedly undisputed and material facts in its motion. Jackson responded and identified an additional 162 facts assertedly material to the motion. The parties have submitted excerpts from 14 depositions. As explained below, the court finds that both of Jackson's claims for relief turn on disputed issues of material fact.

I. *Standard for Summary Judgment*

The standard for summary judgment is well established. If the pleadings, discovery responses, depositions, and any affidavits show there is no genuine issue of any material fact and that the moving party is

entitled to a judgment as a matter of law, the court shall grant a motion for summary judgment. See Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the court must consider the evidence in the record in the light reasonably most favorable to the non-moving party, giving that party the benefit of all genuine disputes of fact and the benefit of all reasonable inferences from the evidence. The court must ask, in essence, if the evidence at trial were the evidence submitted on paper with the motion for summary judgment, would the court have to grant a motion for judgment as a matter of law? See, *e.g., Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997); *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1402 (7th Cir.1996).

If, after viewing the evidence through this lens, there is no question of material fact remaining in the case, then summary judgment should be granted. However, a motion for summary judgment does not provide a vehicle for resolving issues of credibility or for choosing from among competing reasonable inferences from the evidence, such as the reasons for an employer's decision to fire an employee. See *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.1997); *Pettis v. Alexander Graphics, Ltd.*, 52 F.Supp.2d 950, 954 (S.D.Ind.1999).

There is no separate version of Rule 56 that applies to employment discrimination cases. See *Wallace*, 103 F.3d at 1396. In an employment discrimination case, as in any case, the court must consider the record carefully and must do its best to ensure that the court does not substitute its judgment for a jury's resolution of genuinely disputed material issues of fact, but the court must also grant summary judgment to a party entitled to it. Cf. *Adusumilli v. City of Chicago*, 164 F.3d 353, 360–61 (7th Cir.1998) (courts should apply summary judgment standard with "particular care" in employment discrimination cases).

## II. *ERISA Discrimination Claim*

Under Section 510 of ERISA, it is unlawful for an employer "to discharge, \*\*\* discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . ." 29 U.S.C. § 1140. To evaluate claims under this provision, the Seventh Circuit has adapted the direct and indirect methods of proof developed under Title VII of the Civil Rights Act of 1964 and applied broadly under federal employment discrimination laws. See *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir.1996), applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To make out a pure indirect proof case under Section 510 of ERISA, a *prima facie* case requires a showing by plaintiff that he "(1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate was present." *Grottkau*, 79 F.3d at 73.

The world of employment discrimination cases often tends to be divided in two, between so-called "direct evidence" cases in which there is evidence that the employer has virtually confessed to unlawful discrimination, and "indirect proof" cases following the *McDonnell Douglas* model. The Seventh Circuit has repeatedly reminded district judges, attorneys, and litigants, however, that this world of cases is a little more complex. So-called "direct evidence" may amount to a confession, but it may also consist of a mosaic of circumstantial evidence—comments by supervisors, suspicious timing, inconsistent explanations or behavior, and so on—that supports a reasonable inference of discrimination apart from the mechanics of the many variations and adaptations of the *McDonnell Douglas* test. See *Venters v. City of Delphi*, 123 F.3d at 973 (reversing summary judgment for em-

ployer; "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality"); *Wallace v. SMC Pneumatics*, 103 F.3d at 1397; *Troupe v. May Department Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994) (plaintiff not required to show either admission of guilt or all elements of indirect prima facie case to avoid summary judgment; circumstantial evidence showing a "convincing mosaic of discrimination" would suffice).

In this case, Jackson has come forward with ample evidence that could allow a reasonable trier of fact to conclude that Service Engineering fired him because of his wife's medical condition, the resulting expenses, and his refusal to give up medical coverage for her.

In March 1995, Jackson told Service Engineering president Robert Jennings that his wife was going to need a liver transplant. Service Engineering provided health insurance for its employees and their families. Most of those expenses were "self-insured," meaning that Service Engineering simply paid those expenses. Like many other employers, however, Service Engineering protected itself from extremely high-cost care by purchasing a "stop-loss" insurance policy from Lloyds of London. The stop-loss policy paid for care of a beneficiary above a high deductible amount, originally $25,000 per beneficiary.

In September 1995, shortly before the annual renewal date of the stop-loss policy, Lloyds informed Service Engineering's insurance broker that it did not intend to renew the policy because of the high expenses of caring for Mrs. Jackson. However, Lloyds later agreed to renew the policy with the condition that the stop-loss deductible for Mrs. Jackson would be $100,000, so that Service Engineering was obliged to pay the first $100,000 in annual medical expenses for Mrs. Jackson. For all insureds other than Mrs. Jackson,

Lloyds provided stop-loss coverage for costs in excess of $25,000 per year.

In late 1995, after that change in the stop-loss policy, Jennings and the insurance broker met with Mr. and Mrs. Jackson to discuss health insurance coverage. Jennings and the broker told the Jacksons they wanted to explore other options, which included Medicare coverage beginning in March 1996 (when Mrs. Jackson would first become eligible), a state insurance pool, and a separate policy for only Mrs. Jackson. They learned the state pool was not a viable option because it would not cover a liver transplant. Also, Service Engineering could not single out Mrs. Jackson and remove her from the company policy as long as the company employed her husband and provided health insurance coverage generally to employees and their families. However, if the Jacksons themselves decided to remove Mrs. Jackson from the company policy, that would have been permissible, and Service Engineering was interested in having the Jacksons agree to do so. The insurance broker explained to Jennings that Medicare would not cover Mrs. Jackson as long as she was covered by the Service Engineering policy.

In April 1996, Jennings, the broker, the Jacksons, and Jack Clements of Service Engineering met again to discuss Mrs. Jackson's situation. Viewing the evidence in the light most favorable to plaintiff, Service Engineering hoped to get the Jacksons to agree to take Mrs. Jackson off the group policy, but Mrs. Jackson said she would not do that because the company's prescription drug plan was more comprehensive than the Medicare coverage. Jennings said at this meeting that he could solve the insurance problem by firing Jackson, or by setting up Jackson as an independent contractor and giving him $10,000 as an incentive. The meeting ended without an apparent conclusion because Mrs. Jackson said the meeting was too stressful in light of her planned surgery in June.

Mrs. Jackson had her transplant in June 1996, and Service Engineering paid $100,-

000 toward her medical expenses during the 1995–96 term of the stop-loss policy. In autumn 1996, Lloyds again insisted on a deductible for Mrs. Jackson of $100,000. Service Engineering bought a new policy on those terms. At the end of September or beginning of October 1997, Service Engineering's Insurance broker found a new policy with a different insurer that would require a stop-loss amount for Mrs. Jackson of $40,000 per year instead of the $100,000 demanded by Lloyds. Service Engineering chose the new policy with the $40,000 limit for Mrs. Jackson.

Jackson has come forward with other evidence relating to the insurance cost issue and his employment status. Jackson did not receive an annual wage increase in 1996. Jackson testified in his affidavit that Service Engineering supervisor Ron Stoeffler told him that Jennings refused to approve a raise for Jackson because he had paid enough out on Mrs. Jackson's insurance. R. Jackson Aff. ¶ 16.[1] Jackson has also come forward with evidence that Jennings had Clements call the Medicare fiscal intermediary, and that Clements falsely told the Medicare fiscal intermediary that Jackson wanted to drop health insurance coverage for his wife. Locke Dep. 32; Joint Ex. A at 4.[2] Clements' contacts with the fiscal intermediary produced a warning to Service Engineering that federal law prohibits an employer to offer an incentive to a person not to enroll in a group health plan so that the person can be covered by Medicare instead. See Joint Ex. A at 8–9, explaining 42 U.S.C. § 1395y(b)(3)(C).

Service Engineering devotes a great deal of effort to arguing that discussions between the Jacksons and Service Engineering's president Jennings, his assistant Jack Clements, and its insurance broker from autumn 1995 through April 1996 were, as a matter of law, too remote in time from the November 1997 firing to be relevant.

Service Engineering's argument ignores the evidence of a conversation between Jennings and Jackson on September 29, 1997, about five weeks before Jackson was fired. The record indicates that Jennings approached Jackson. He told Jackson that he (Jennings) had paid a lot of money for Mrs. Jackson and that he was not going to pay more. Jennings also told Jackson that either Jackson would do something about insurance or Jennings would do something. See R. Jackson Dep. 140–42, 172–74.

What could Jennings have done about insurance? Based on the earlier discussions in April 1996, Jackson knew the state insurance pool was not an option. He knew Medicare was not an option for Jennings. He also knew that Jennings had said in the earlier meetings that he could solve the insurance coverage problem by firing him. Jennings had said in 1995 that he did not intend to do that, but in September 1997, Jackson knew that Jennings did not have any other practical alternatives if he meant to "do something" about Mrs. Jackson's health care costs. This pattern of evidence goes well beyond the pure indirect proof method of *McDonnell Douglas*.[3]

1. Service Engineering has moved to strike this evidence as hearsay. A supervisor's explanation of the reason for a decision about wages is plainly an admission by the employer that falls outside the definition of hearsay. See Fed.R.Evid. 801(d)(2). The motion to strike Paragraph 6 is overruled.

2. Service Engineering has also moved to strike page 4 of Joint Exhibit A as hearsay. That page consists of handwritten notes by Alice Locke, an employee of the fiscal intermediary, from telephone calls with Mrs. Jackson and with Clements. Locke's account of her conversation with Clements is admissible as an admission by Service Engineering, see Fed.R.Evid. 801(d)(2), and Locke's deposition testimony provided a sufficient foundation for the notes of the conversation. However, Locke's account of what Mrs. Jackson told her Service Engineering managers had done and said is inadmissible hearsay, which the court has not considered as substantive evidence.

3. Service Engineering contends the undisputed facts show that by November 3, 1997, when Jackson was fired, the insurance prob-

■ In addition, the parties have offered conflicting accounts of the altercation between Jackson and Clements on Friday, October .31, 1997, and the meeting. that ended with Jennings firing Jackson on Monday, November 3, 1997. Viewing the evidence in the light most favorable to Jackson, a reasonable trier of fact could find (a) that even if Jackson deserved some sort of discipline based on these incidents, no one else would have been fired for comparable conduct, and (b) that Jennings decided to take advantage of the situation to fire Jackson in order to remove the burden of Mrs. Jackson's future medical expenses. That is not the only fair reading of the evidence, but on a motion for summary judgment, it is a reasonable reading of the evidence. Accordingly, Service Engineering's motion for summary judgment is denied as to Jackson's claim under ERISA. See *Hirsch v. National Mall & Service, Inc.*, 989 F.Supp. 977, 983–84 (N.D.Ill.1997) (denying summary judgment on similar ERISA

lem with Mrs. Jackson had been "resolved." The court disagrees, at least as a matter of law. Viewing this evidence in the light reasonably most favorable to plaintiff Jackson, a trier of fact could reasonably find that even though the new policy was not as bad as the old Lloyds policy, Jennings still thought he and Service Engineering had paid enough to take care of Mrs. Jackson and that the only viable *complete* solution to the problem was to fire Jackson.

4. In its Interpretive Guidance on Title I of the ADA, the EEOC has written with respect to the relationship or association provision:

This provision is intended to protect any qualified individual, whether or not that individual has a disability, from discrimination because that person is known to have an association or relationship with an individual who has a known disability. This protection is not limited to those who have a familial relationship with an individual with a disability.

To illustrate the scope of this provision, assume that a qualified applicant without a disability applies for a job and discloses to the employer that his or her spouse has a disability. The employer thereupon declines to hire the applicant because the employer believes that the applicant would have to miss work or frequently leave work

retaliation claim where employer's officers were aware of employee's cancer and rising insurance costs, and had discussed savings for company by firing ill employee).

## III. *ADA Association Claim*

The ADA includes in its definition of prohibited discrimination "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association...." 42 U.S.C. § 12112(b)(4); see also 29 C.F.R. § 1630.8.

Jackson's theory under the ADA is that when Service Engineering fired him, it knew his wife had a disability, or at least had a record of having a disability, within the scope of the ADA, and then discriminated against him by firing him because of his "association" with her.[4]

Service Engineering argues it is entitled to summary judgment because a reasonable jury could not find that it fired Jack-

early in order to care for the spouse. Such a refusal to hire would be prohibited by this provision. Similarly, this provision would prohibit an employer from discharging an employee because the employee does volunteer work with people who have AIDS, and the employer fears that the employee may contract the disease.

This provision also applies to other benefits and privileges of employment. *For example, an employer that provides health insurance benefits to its employees for their dependents may not reduce the level of those benefits to an employee simply because that employee has a dependent with a disability. This is true even if the provision of such benefits would result in increased health insurance costs for the employer.*

It should be noted, however, that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability. See Senate Report at 30; House Labor Report at 61–62; House Judiciary Report at 38–39.

29 C.F.R. Pt. 1630 App., § 1630.8 (emphasis added).

son because of his wife's real or perceived disability. The Seventh Circuit has not yet specifically addressed "association" claims under the ADA. The circuits that have done so have adapted the direct and indirect methods of proof from other ADA discrimination claims, which in turn have been adapted from other federal employment statutes.

In *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir.1997), the court explained that a *prima facie* case under the indirect method derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), would consist of proof that: (1) the plaintiff was qualified for the job at the time of the adverse employment action; (2) the plaintiff was subjected to an adverse employment action; (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. Accord, *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1230–31 (11th Cir.1999) (following *Den Hartog*). The Tenth and Eleventh Circuits' adaptation of legal standards to "association" claims under the ADA presumably would extend to other methods of proof as well, including direct proof of an intent to discriminate based on the disability of a relative or associate.

On this issue, there is no significant difference between the analysis under the ADA and ERISA. For the reasons explained above in Part II, a reasonable jury could find on this record that Service Engineering fired Jackson because of the expenses it had incurred and the prospect of more expenses as a result of Mrs. Jackson's condition.

However, Service Engineering also argues that Jackson's ADA claim fails at a more fundamental level. Service Engineering contends Mrs. Jackson did not actually have a "disability" within the meaning of the ADA at the time it fired Jackson. The "association" provision in the ADA prohibits discrimination based on a "known disability of an individual with whom the qualifying individual is known to have a relationship or association...." 42 U.S.C. § 12112(b)(4). The ADA in turn defines "disability" with respect to an individual as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Major life activities" are in turn defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means that a person is unable to perform a major life activity that the average person in the general population can perform, or is significantly restricted as to the condition, manner, or duration under which the person can perform a particular major life activity as compared to an average person in the general population. See 29 C.F.R. § 1630.2(j).

Service Engineering contends Mrs. Jackson did not have a disability under the ADA in November 1997 in light of evidence that Mrs. Jackson's June 1996 liver transplant had been successful. In November 1997, she was working a full-time job without medical restrictions and was even playing golf two days a week.

The federal statute most clearly tailored to address the situation alleged by Jackson is the ERISA retaliation provision, 29 U.S.C. § 1140, discussed above. Judge Moran of the Northern District of Illinois has explained that the ADA was not designed to fit this situation—firing an employee because of the expense of insuring a family member—as well as ERISA was. See *Hirsch v. National Mall & Service*,

*Inc.,* 989 F.Supp. at 980. Even if the ADA's fit is not as snug as that under ERISA, however, the association bar in the ADA can apply to this situation, and the EEOC has interpreted the ADA as applying to situations like this. The EEOC's interpretive guidance includes as one example: "For example, an employer that provides health insurance benefits to its employees for their dependents may not reduce the level of those benefits to an employee simply because that employee has a dependent with a disability. This is true even if the provision of such benefits would result in increased health insurance costs for the employer." 29 C.F.R. Pt. 1630, App., § 1630.8. If the ADA prohibits an employer from reducing benefits to an employee for that reason, it also prohibits the employer from firing the employee for the same reason.

The court assumes for purposes of argument that Mrs. Jackson's improved post-transplant condition in November 1997 did not amount to an actual disability under the ADA. The more difficult issue is whether a jury could find that Service Engineering regarded or had a record of Mrs. Jackson as a person with a disability under the ADA. See 42 U.S.C. § 12102(2) (definition of disability). The issue is difficult because in the years since the ADA took effect, a substantial and elaborate body of law has developed concerning the scope of an actual disability under the ADA. See, *e.g., Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999) (effects of measures to correct for or mitigate impairments must be considered when determining whether a person is "substantially limited" in a major life activity); *Albertsons, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Skorup v. Modern Door Corp.,* 153 F.3d 512, 514–15 (7th Cir.1998) (affirming summary judgment for employer where employee failed to show impairment barred her from class or broad range of jobs); *Christian v. St. Anthony Medical Center, Inc.,* 117 F.3d 1051, 1053 (7th Cir.1997) (ADA does not provide "general protection of medically afflicted persons").

Service Engineering argues here that the "record of" and "regarded as" definitions of disability require evidence that addresses all the complexities and nuances of the evolving legal definition of actual disability under the ADA. That strict an approach would not be consistent with the ADA's provisions to prevent discrimination on the basis of perceived disabilities, for it is surely rare that a person making a decision to fire a person based on a perceived disability thinks through, let alone creates evidence of, all those elements and nuances in the legal definition of disability.

For example, when addressing limitations on the "major life activity" of "working," courts have often explained that a person's inability to perform one specific job does not amount to a disability. The person must instead come forward with evidence that her condition limits her ability to perform a class of jobs or a broad range of jobs. See *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999) ("to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job"); *Skorup,* 153 F.3d at 514–15. An employer who "regards" an employee as disabled, however, is more likely to focus on an employee's perceived inability to perform one job—her own—without worrying about whether the perceived condition might also limit her ability to perform a broader class of jobs.

The Supreme Court has plainly chosen to require employees to go further, so that where the plaintiff asserts she is "regarded as" disabled because she is substantially impaired in the major life activity of "working," she must show she is regarded as unable to perform a class of jobs beyond the particular job in question. *Sutton,* 119 S.Ct. at 2151–52; *Murphy,* 119 S.Ct. at 2138–39; accord, *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 510–11 (7th Cir.1998) ("regarded as" definition re-

quires that "employer's perception of the plaintiff's inability to work must have a comparable breadth" to definition of actual disability).

The real problem here is one of proof. How broadly did the employer, subjectively, view the person's impairment? The Supreme Court addressed a similar problem under the Eighth Amendment in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment prohibits prison and jail officials from acting with "deliberate indifference" to a prisoner's basic, minimal needs for health and safety. In *Farmer* the Supreme Court held that "deliberate indifference" refers to the prison official's subjective state of mind, requiring proof that the prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. The Court went on to explain, however, that whether the defendant official had "the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842, 114 S.Ct. 1970. Thus, a jury can infer that an official had actual knowledge of a risk based on evidence that the risk was obvious. *Id.*

Similarly here, the issue of the employer's subjective perception of the degree of Mrs. Jackson's impairment can be addressed through circumstantial evidence. Jackson has come forward with evidence that Jennings knew Mrs. Jackson's liver disease was a "serious medical condition,"

that she had taken retirement from a "pretty good job" because of her illness, and that she was receiving Social Security disability benefits. Jennings Dep. 31–33; Pl.Ex. 31.[5] After learning that Mrs. Jackson needed a liver transplant, Jennings also knew, of course, that her condition was life-threatening, and he was painfully aware of the huge medical costs of her treatment. There is also evidence he was concerned about the prospect of future medical costs for Mrs. Jackson. Just over a month before Jennings fired Jackson, he told Jackson that his wife had cost the company a lot of money and that the company was not going to pay any more. Jennings told Jackson that if he did not do something about the insurance, Jennings would. R. Jackson Dep. 140–42, 172–74.

■ Viewing this evidence in the light reasonably most favorable to plaintiff Jackson, and especially in view of the stringent standard for Social Security disability benefits (which generally requires proof that the claimant is unable to perform any kind of gainful employment available in the economy for at least a year), the court cannot say that a jury would be acting unreasonably if it found that Service Engineering had a record of Mrs. Jackson as substantially limited in the major life activity of working and/or that Jennings regarded her as substantially limited in the major life activity of working. It is virtually certain, of course, that Jennings did not think in precisely those terms drawn from the ADA, but a jury could reasonably infer from circumstantial evidence about what Jennings knew about Mrs. Jackson's condition that he regarded her as unable to perform broad classes of

---

**5.** Service Engineering admits Jennings knew Mrs. Jackson had applied for Social Security benefits but contends he did not know she was ever receiving such benefits. Plaintiff's Exhibit 31 shows notes by the company's insurance broker concerning information he appears to have received from Jennings on September 21, 1995, including a statement that Mrs. Jackson "is on Social Security disability." For purposes of summary judgment, therefore, the court gives plaintiff the benefit

of the doubt on the disputed factual question. Although the stringent standards for Social Security disability benefits do not match precisely the criteria of the ADA, see *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 1602–03, 143 L.Ed.2d 966 (1999), Service Engineering's knowledge that Mrs. Jackson was receiving those benefits contributed to her "record" of having a disability.

jobs, thus meeting the standard set forth in *Sutton* and *Murphy*.[6]

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment is hereby denied with respect to plaintiff's claim under ERISA and with respect to plaintiff's claim under the ADA. Trial remains scheduled for April 17, 2000, with a final pretrial conference on April 7, 2000, at 3:00 p.m.

So ordered.

6. Jackson argues that evidence of Mrs. Jackson's actual condition in November 1997 is irrelevant because Service Engineering's Jennings did not know about her actual condition when he decided to fire Jackson. In the court's view, to the extent Jackson relies on a theory that he was discriminated against because of his association with a person with an actual disability, evidence of an actual disability at the relevant time would seem essential. Mrs. Jackson's actual condition at the time of Jennings' decision would not be critical, however, to Jackson's theory that Mrs. Jackson had a record of disability or that Jennings regarded her as having a disability.