PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES G. ROBINSON,
            *Plaintiff-Appellant,*

v.

THOMAS W. GLYNN,
            *Defendant-Appellee,*

and

GLYNN SCIENTIFIC, INCORPORATED;
GEOPHONE COMPANY, LLC,
            *Defendants.*

No. 03-1106

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-98-4168-JFM, CA-99-1956-JFM)

Argued: September 24, 2003

Decided: November 13, 2003

Before WILKINSON and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Gregory and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** Richard Louis Brusca, SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, L.L.P., Washington, D.C., for Appellant. Tim-

othy Cronin Lynch, SHAR, ROSEN & WARSHAW, L.L.C., Baltimore, Maryland, for Appellee. **ON BRIEF:** Marc Selden Rosen, SHAR, ROSEN & WARSHAW, L.L.C., Baltimore, Maryland, for Appellee.

## OPINION

WILKINSON, Circuit Judge:

Plaintiff James Robinson filed suit against Thomas Glynn, Glynn Scientific, Inc., and GeoPhone Company, LLC, alleging that Glynn committed federal securities fraud when he sold Robinson a partial interest in Geophone Company. The district court found that Robinson's membership interest in GeoPhone was not a security within the meaning of the federal securities laws, and it dismissed Robinson's securities fraud claim. Because Robinson was an active and knowledgeable executive at GeoPhone, rather than a mere passive investor in the company, we affirm. To do otherwise would unjustifiably expand the scope of the federal securities laws by treating an ordinary commercial venture as an investment contract.

I.

Robinson appeals from a grant of summary judgment to Glynn, and accordingly we take the facts in the light most favorable to Robinson. *See, e.g.*, *McLean v. Patten Communities, Inc.*, 332 F.3d 714, 719 (4th Cir. 2003). In 1995, Glynn organized GeoPhone Corporation to develop and commercially market the GeoPhone telecommunications system. The GeoPhone system was designed around a signal processing technology, Convolutional Ambiguity Multiple Access (CAMA), that Glynn purportedly designed. Glynn was GeoPhone Corporation's majority shareholder and chairman. In September 1995, GeoPhone Corporation became a limited liability company, GeoPhone Company, LLC. LLCs are noncorporate business entities that offer their members limited liability, tax benefits, and organizational flexibility.

In March 1995, Glynn and his associates contacted James Robinson, a businessman with no prior telecommunications experience, in

an effort to raise capital for GeoPhone. Over the next several months, Glynn met and corresponded with Robinson, attempting to convince Robinson to invest in GeoPhone. Glynn described to Robinson the CAMA technology, its centrality to the GeoPhone system, and Geo-Phone's business plan. In July 1995, Robinson agreed to loan Glynn $1 million so that Glynn could perform a field test of the GeoPhone system and the CAMA technology.

In addition to Robinson's loan, in August 1995 Robinson and Glynn executed a "Letter of Intent," in which Robinson pledged to invest up to $25 million in GeoPhone, LLC if the field test indicated that CAMA worked in the GeoPhone system. Robinson's $25 million investment was to be comprised of his initial $1 million loan, an immediate $14 million investment upon successful completion of the field test, and a later $10 million investment. In October 1995, engi-neers hired by Glynn performed the field test, but, apparently with Glynn's knowledge, they did not use CAMA in the test. Nevertheless, Glynn allegedly told Robinson that the field test had been a success.

Consistent with the Letter of Intent, in December 1995 Robinson and Glynn executed an "Agreement to Purchase Membership Interests in GeoPhone" (APMIG). Under the APMIG, Robinson agreed to con-vert his $1 million loan and his $14 million investment into equity and subsequently to invest the additional $10 million. Robinson and Glynn also entered into an "Amended and Restated GeoPhone Oper-ating Agreement" (ARGOA), which detailed the capital contribution, share ownership, and management structure of GeoPhone.

Pursuant to the ARGOA, Robinson received 33,333 of GeoPhone's 133,333 shares. On the back of the share certificates that Robinson received, the restrictive legend referred to the certificates as "shares" and "securities." It also specified that the certificates were exempt from registration under the Securities Act of 1933, and stated that the certificates could not be transferred without proper registration under the federal and state securities laws.

In addition, the ARGOA established a seven-person board of man-agers that was authorized to manage GeoPhone's affairs. Two of the managers were to be appointed by Robinson with the remaining five appointed by Glynn and his brother. Finally, the ARGOA vested man-

agement of GeoPhone in Robinson and Glynn based on each member's ownership share. Robinson was named GeoPhone's treasurer, and he was appointed to the board of managers and the company's executive committee. Glynn served as GeoPhone's chairman and was intimately involved in the company's operations and technical development.

Trouble first surfaced only a few months later in April 1996, when Robinson sued Glynn in Maryland state court. Robinson alleged breach of fiduciary duty, fraud, and conversion, all due to Glynn's purported mismanagement of GeoPhone funds. In October 1997, Robinson and Glynn settled the state court action, and as part of the settlement in November 1997 they entered into a "Membership Interest Purchase Agreement" (MIPA). Under the MIPA, Robinson purchased all of Glynn's shares in GeoPhone.

Yet in 1998 Robinson allegedly learned for the first time that the CAMA technology had never been implemented in the GeoPhone system — not even in the field test that had provided the basis for Robinson's investment. Robinson then filed suit in federal court, claiming violation of the federal securities laws, specifically § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. The district court, however, granted summary judgment to Glynn, because it found that Robinson's membership interest in GeoPhone, LLC did not constitute a security under the federal securities laws. Robinson now challenges the district court's dismissal of his federal securities law claim.[1]

## II.

In order to establish a claim under Rule 10b-5, Robinson must prove fraud in connection with the purchase of securities. *See* 17 C.F.R. § 240.10b-5; *Gasner v. Board of Supervisors of the County of Dinwiddie*, 103 F.3d 351, 356 (4th Cir. 1996). The Securities Act of

---

[1]In addition to his federal securities law claim, Robinson also brought several state law claims. Once the district court had dismissed Robinson's federal claim, it declined to exercise supplemental jurisdiction over his remaining state law claims. Robinson does not challenge this aspect of the district court's decision.

1933, 15 U.S.C. § 77b(a)(1), and the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), define a "security" broadly as "any note, stock, treasury stock, security future, bond, debenture, . . . , investment contract, . . . , or, in general, any interest or instrument commonly known as a 'security.'"[2] In this case, Robinson claims that his membership interest in GeoPhone, a limited liability company (LLC), qualifies as either an "investment contract" or "stock" under the Securities Acts.

A.

The district court determined that Robinson's interest in GeoPhone was not an investment contract, a question of law that we review de novo. The Supreme Court has defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey, Co.*, 328 U.S. 293, 298-99 (1946). The parties agree that Robinson invested his money in a common enterprise with an expectation of profits. Their disagreement concerns whether Robinson expected profits "solely from the efforts" of others, most notably Glynn.

Since *Howey*, however, the Supreme Court has endorsed relaxation of the requirement that an investor rely only on others' efforts, by omitting the word "solely" from its restatements of the *Howey* test. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 561 (1979) (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975)). And neither our court nor our sister circuits have required that an investor like Robinson expect profits "solely" from the efforts of others. *See Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 n.4 (4th Cir. 1988) (citing cases). Requiring investors to rely wholly on the efforts of others would exclude from the protection of the securities laws any agreement that involved even slight efforts from investors themselves. *See Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918, 920 (4th Cir. 1990). It would also exclude

---

[2]The Securities Acts' definitions of "security" differ in wording only slightly and are generally treated as identical in meaning. *See Teague v. Bakker*, 35 F.3d 978, 986 n.6 (4th Cir. 1994) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n.1 (1985)).

any agreement that offered investors control in theory, but denied it to them in fact. Agreements do not annul the securities laws by retaining nominal powers for investors unable to exercise them. *See id.* at 922 n.6; *see also Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 133 (5th Cir. 1989).

What matters more than the form of an investment scheme is the "economic reality" that it represents. *See Rivanna*, 840 F.2d at 240 n.4. The question is whether an investor, as a result of the investment agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment. *See id.* at 240-41; *see also Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981). Elevating substance over form in this way ensures that the term "investment contract" embodies "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

### B.

In looking at the powers accorded Robinson under GeoPhone's operating agreement, as well as Robinson's activity as an executive at GeoPhone, it is clear that Robinson was no passive investor heavily dependent on the efforts of others like Glynn. Under the ARGOA, management authority for GeoPhone resided in a board of managers. Robinson not only had the power to appoint two of the board members, but he himself assumed one of the board seats and was named as the board's vice-chairman. The board, in turn, delegated extensive responsibility to a four-person executive committee of which Robinson was also a member.

In addition, Robinson served as GeoPhone's Treasurer. Among his powers were the ability to select external financial and legal consultants; to consult with GeoPhone's Chief Financial Officer on all financial matters relating to the company; to review status reports from the President and other officers; and to assemble the executive committee in order to discuss variations from GeoPhone's operating plan. Beyond even these fairly extensive powers, the ARGOA forbade GeoPhone from either incurring any indebtedness outside the normal course of business without Robinson's approval or diluting his

interest in GeoPhone without first consulting him. In short, Robinson carefully negotiated for a level of control "antithetical to the notion of member passivity" required to find an investment contract under the federal securities laws. *Keith v. Black Diamond Advisors, Inc.*, 48 F.Supp.2d 326, 333 (S.D.N.Y. 1999).

None of this, of course, establishes that Robinson could entirely direct the affairs of GeoPhone. He controlled neither the board nor the executive committee, and he lacked the technological expertise of Glynn and others at the company. But Robinson was not interested in sole managerial control of GeoPhone; he was interested instead in sufficient managerial control to ensure that other managers like Glynn could neither harm nor dilute his investment. Through his positions as Treasurer, Vice-Chairman of the Board, and member of Geo-Phone's executive committee, Robinson may have lacked "decisive control over major decisions," but he preserved "the sort of influence which generally provide[d] [him] with access to important information and protection against a dependence on others." *Rivanna*, 840 F.2d at 241 (internal quotation omitted).

Robinson argues, however, that his lack of technological expertise relative to Glynn prevented him from meaningfully exercising his rights. We faced essentially the same legal argument in *Rivanna*, and found that it assumed too much. *See id.* at 242 n.10. To the extent that Robinson needed assistance in understanding any particular aspect of the CAMA technology, nothing prevented him from seeking it from outside parties or others at GeoPhone. *See id.*; *Banghart v. Hollywood Gen. P'ship*, 902 F.2d 805, 808 n.5 (10th Cir. 1990). In fact, prior to purchasing all of Glynn's shares in GeoPhone, Robinson asked his accountant to scrutinize the company's financial records, and he hired an outside engineer to study the company's technology and market potential.

Indeed, the record amply supports the district court's conclusion that Robinson exercised his management rights despite his lack of technical expertise. For instance, Robinson reviewed GeoPhone's technology and financial records, as well as weekly status reports from GeoPhone's President, Chief Operating Officer, and Chief Financial Officer covering numerous aspects of GeoPhone's operation. He disapproved disbursements and proposed licenses of the Geo-

Phone technology. Robinson even expressed to the board of managers problems he perceived with GeoPhone, including the company's technological development, its management, and marketability. In the end, Robinson generally asserts that he lacked technical sophistication, without explaining in any detail what was beyond his ken or why it left him powerless to exercise his management rights.

Moreover, Robinson's argument would work a fundamental and unjustifiable expansion in the securities laws by bringing innumerable commercial ventures within their purview. Business ventures often find their genesis in the different contributions of diverse individuals — for instance, as here, where one contributes his technical expertise and another his capital and business acumen. Yet the securities laws do not extend to every person who lacks the specialized knowledge of his partners or colleagues, without a showing that this lack of knowledge prevents him from meaningfully controlling his investment. Here, Robinson concedes that "nothing of consequence that would affect [his] position adversely could be done without [his] prior expressed approval," thus undermining his claim that his lack of technical expertise left him powerless over his investment. In essence, Robinson was a savvy and experienced businessman who negotiated for formal management rights and actively exercised those rights, only now relying on his lack of technical sophistication to claim the cover of the federal securities laws.

Robinson's opportunity, especially as an executive at GeoPhone, to oversee his interests distinguishes his case from *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918 (4th Cir. 1990). In *Bailey*, we found that a cattle breeding program was an investment contract, in part because the investors lacked specialized expertise in crossbreeding and cattle breeding selection. *See id.* at 924-25 & n.13. Yet the *Bailey* investors' lack of specialized knowledge alone did not convert their interest into a security — again, such a result would bring a host of commercial enterprises within the ambit of the securities laws. Rather, the *Bailey* investors lacked the indicia of control — formal and actual — that mark active investors like Robinson. *See id.* at 923-24. And unlike the present case, the *Bailey* investors ran headlong into a coordination problem that heightened their dependence on the breeders: no single investor owned enough cattle to run a breeding program, and so they relied on the breeders to pool their herds and

coordinate the process. *See id.* at 924-25; *see also Howey*, 328 U.S. at 300. Robinson was GeoPhone's only major investor, and he was not dependent on the investments or expertise of others.

Finally, Robinson argues that he and Glynn considered his interest in GeoPhone a security, based on language in the APMIG, in the ARGOA, and on the back of Robinson's GeoPhone certificates. For instance, the restrictive legend on the back of Robinson's certificates refers to the certificates as "shares" and "securities." While this may be persuasive evidence that Robinson and Glynn believed the securities laws to apply, it does not indicate that their understanding was well-founded. Just as agreements cannot evade the securities laws by reserving powers to members unable to exercise them, neither can agreements invoke those same laws simply by labelling commercial ventures as securities. It is the "economic reality" of a particular instrument, rather than the label attached to it, that ultimately determines whether it falls within the reach of the securities laws. *See Great Rivers Coop. v. Farmland Indus., Inc.*, 198 F.3d 685, 701 (8th Cir. 1999). The "economic reality" here is that Robinson was not a passive investor relying on the efforts of others, but a knowledgeable executive actively protecting his interest and position in the company.

## III.

Robinson further claims that his membership interest in GeoPhone was not only an "investment contract" within the meaning of the federal securities laws, but "stock" as well.[3] Congress intended catch-all terms like "investment contract" to encompass the range of novel and unusual instruments whose economic realities invite application of the securities laws; but the term "stock" refers to a narrower set of instruments with a common name and characteristics. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). Thus the securities laws apply "when an instrument is both called 'stock' and bears stock's usual characteristics." *Id.* Yet Robinson's membership interest was

---

[3]The Securities Acts define a "security" as "any note, stock, treasury stock, security future, bond, debenture, . . . , investment contract, . . . , or, in general, any interest or instrument commonly known as a 'security.'" 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10).

neither denominated stock by the parties, nor did it possess all the usual characteristics of stock.

The characteristics typically associated with common stock are (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value. *See id.* Robinson's membership interest in GeoPhone lacked several of these characteristics. *Consider Great Lakes Chemical Corp. v. Monsanto Co.*, 96 F.Supp.2d 376, 387-89 (D. Del. 2000) (finding that LLC membership interests do not constitute stock under *Landreth*).

First, as is common with interests in LLCs, GeoPhone's members did not share in the profits in proportion to the number of their shares. *See* Larry E. Ribstein, *Form and Substance in the Definition of a "Security": The Case of Limited Liability Companies*, 51 Wash. & Lee L. Rev. 807, 833 (1994) (noting that "LLC statutes usually do not provide for dividend rights"). Pursuant to the ARGOA, Robinson was to receive 100 percent of GeoPhone's net profits up to a certain amount, only after which were funds to be distributed pro rata to the members in proportion to their relative shares.

Second, like interests in LLCs more generally, Robinson's membership interests were not freely negotiable. *See id.* (observing that LLC statutes "invariably restrict transferability of management rights"). According to the ARGOA, Robinson could only transfer his interests if he first offered other members the opportunity to purchase his interests on similar terms. Moreover, unlike with stock (except some stock in close corporations), anyone to whom Robinson or other members transferred their interests would not have thereby acquired any of the control or management rights that normally attend a stock transfer. *See* Carol R. Goforth, *Why Limited Liability Company Membership Interests Should Not Be Treated as Securities and Possible Steps to Encourage This Result*, 45 Hastings L.J. 1223, 1247 (1994) (discussing ability of corporate stockholders, unlike owners of LLC interests, to convey all attributes of ownership without additional third-party consent). Rather, the ARGOA requires that transferees satisfy several conditions to become members, in addition to receiving the approval of a majority of GeoPhone's managers.

Similarly, Robinson could pledge his interest, but the pledgee would acquire only distribution rights and not control rights. *See id.* ("Unlike stock, however, the pledgee [of a LLC membership interest] acquires no rights to become a substitute owner with rights to participate in control of the entity upon default of the pledgor."). As for the apportionment of voting rights, the parties dispute whether voting rights were conferred in proportion to members' interests in Geo-Phone. Even resolving this dispute in Robinson's favor, it remains clear that Robinson's membership interest lacked the ordinary attributes of stock.

Finally, from the very beginning Robinson and Glynn consistently viewed Robinson's investment as a "membership interest," and never as "stock." The purchase and operating agreements that Robinson and Glynn executed, as well as the agreement in which Robinson bought out Glynn's interest in GeoPhone, all termed Robinson's investment as a "membership interest" rather than "stock." Even the shares that Robinson received as a result of his investments declared Robinson the holder of "membership interests in GeoPhone Company, L.L.C., within the meaning of the Delaware Limited Liability Company Act." Robinson thus cannot argue that he was misled into believing that his membership interests were stock whose purchases were governed by the securities laws. *See Landreth*, 471 U.S. at 687, 693 (finding that calling instruments "stock" justifiably leads purchasers to believe that the federal securities laws apply). And it would do violence to the statutory language of the securities laws to include within the term "stock" an instrument that was neither labelled stock nor like stock.

IV.

The parties have vigorously urged us to rule broadly in this case, asking that we generally classify interests in limited liability companies, or LLCs, as investment contracts (Robinson's view) or non-securities (Glynn's view). LLCs are particularly difficult to categorize under the securities laws, however, because they are hybrid business entities that combine features of corporations, general partnerships, and limited partnerships. *See, e.g.*, *Great Lakes*, 96 F.Supp.2d at 383. As their name indicates, LLCs can limit the liability of their members, which may mean that LLC members are more likely to be passive investors who need the protection of the securities laws. *See, e.g.*,

*Ak's Daks Communications, Inc. v. Maryland Sec. Div.*, 771 A.2d 487, 497-98 (Md. Ct. Spec. App. 2001). However, LLC members are also able to actively participate in management without piercing the veil of their liability, which would suggest that LLC members are more likely than limited partners or corporate shareholders to be active investors not in need of the securities statutes. *See, e.g.*, *Great Lakes*, 96 F.Supp.2d at 391-92.

Precisely because LLCs lack standardized membership rights or organizational structures, they can assume an almost unlimited variety of forms. It becomes, then, exceedingly difficult to declare that LLCs, whatever their form, either possess or lack the economic characteristics associated with investment contracts. Even drawing firm lines between member-managed and manager-managed LLCs threatens impermissibly to elevate form over substance. Certainly the members in a member-managed LLC will often have powers too significant to be considered passive investors under the securities laws. And yet even members in a member-managed LLC may be unable as a practical matter to exercise any meaningful control, perhaps because they are too numerous, inexperienced, or geographically disparate. *See, e.g.*, *Nutek Info. Sys., Inc. v. Arizona Corp. Comm'n*, 977 P.2d 826, 831-32 (Ariz. Ct. App. 1998); *S.E.C. v. Parkersburg Wireless Ltd. Liability Co.*, 991 F.Supp. 6, 9 n.3 (D.D.C. 1997). By the same token, while interests in manager-managed LLCs may often be securities, their members need not necessarily be reliant on the efforts on their managers. *See, e.g.*, *Great Lakes*, 96 F.Supp.2d at 392.

We decline, therefore, the parties' invitation for a broader holding. On the facts of this case, it is clear that Robinson did not lack the ability to meaningfully exercise the rights granted him under GeoPhone's operating agreement.[4] To the contrary, Robinson had a significant say

---

[4]The weaknesses of Robinson's case are highlighted by comparison to *S.E.C. v. ETS Payphones, Inc.*, 300 F.3d 1281 (11th Cir. 2002), *cert. granted sub nom*, *S.E.C. v. Edwards*, ___ U.S. ___, 123 S.Ct. 1788, 155 L.Ed.2d 665, 71 U.S.L.W. 3665 (Apr. 21, 2003) (No. 02-1196). *ETS Payphones* involved the sale of pay telephones by a corporation, rather than a limited liability company, to a class of over 10,000 investors. Having purchased the phones, the investors then leased them back to the company for management in exchange for a fixed monthly fee. *See id.*

in GeoPhone's management. If Robinson, despite his own managerial efforts, was misled by Glynn about his investment, his remedy belongs to another forum. The federal securities laws were not intended to be a substitute for state fraud and breach of contract actions.[5] *See Rivanna*, 840 F.2d at 242; *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982). We therefore affirm the district court's dismissal of the action in this case.

*AFFIRMED*

---

at 1282. While the investors retained limited contractual rights under the lease, they were active in neither the company's management nor operation. Their inexperience, geographical dispersion, and lack of access to important information made the *ETS Payphones* investors practically dependent on the efforts of others in a way that Robinson was not.

[5]After the district court's dismissal of Robinson's suit, Robinson refiled his suit in state court, where it remains pending. *See* Tape of Oral Argument, Sept. 24, 2003 (Appellant's Opening Argument).