332 F.3d 714
 Kym MCLEAN, Plaintiff-Appellant,
v.
PATTEN COMMUNITIES, INCORPORATED; Patten Corporation; Bluegreen Communities, Incorporated; Bluegreen Corporation, a/k/a Bluegreen Patten Corporation, Defendants-Appellees.
 No. 99-1167.
 United States Court of Appeals, Fourth Circuit.
 Argued: September 29, 2000.
 Decided: June 17, 2003.
 
 ARGUED: Leto Copeley, Patterson, Harkavy & Lawrence, L.L.P., Raleigh, North Carolina, for Appellant. Walter J. Kruger, III, Fisher & Phillips, L.L.P., Atlanta, Georgia, for Appellees. ON BRIEF: Melinda Lawrence, Patterson, Harkavy & Lawrence, L.L.P., Raleigh, North Carolina, for Appellant. Kelly L. Kubes, Fisher & Phillips, L.L.P., Atlanta, Georgia, for Appellees.
 Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.
 Affirmed in part, vacated in part, and remanded with instructions. Judge WIDENER wrote the opinion, in which Judge NIEMEYER joined. Judge TRAXLER wrote a concurring and dissenting opinion.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 Kym McLean appeals the district court's grant of summary judgment in her employment discrimination action under 42 U.S.C. § 1981 and North Carolina law. We affirm in part and vacate in part the decision of the district court and remand the case for proceedings consistent with this opinion.
 
 I.
 
 2
 In March 1995, Willard Hodge, a white sales manager at Carolina Hills,[1] hired Kym McLean, a 19-year-old black female, as an at-will employee to work as a receptionist at the defendants' Sanford, North Carolina office. Mrs. McLean's duties included answering the telephone, greeting customers, performing payroll duties, filing, rendering accounts payable and receivable, and keeping track of newspaper advertisements.
 
 
 3
 She worked at Patten until August 22, 1995, at which time the company says she resigned, and she says she was discharged. That is a matter of dispute.
 
 
 4
 Mrs. McLean then brought her suit against the defendants, claiming discrimination on account of race with respect to the terms and conditions of her contractual relationship of employment under 42 U.S.C. § 1981 for her first claim for relief. Her second claim for relief was that the public policy of North Carolina prohibited discrimination in employment on account of race and sex and that by discharging her on the basis of race and sex, the defendants had violated the public policy of North Carolina. The third claim for relief was that Hodge and other supervisors were retained by the defendants as employees although they had subjected, or were continuing to subject, Mrs. McLean and other female employees to acts of discrimination and harassment based on race and sex. The district court's decision provided that "she has clarified that she does not seek to state a state law claim for `sexual or racial harassment.'" That is verified on page 2 of Mrs. McLean's brief in this court where she states for her first cause of action that "defendants terminated her on the basis of her race in violation of 42 U.S.C. § 1981"; "[s]econd ... wrongful discharge claims under North Carolina law asserting that the terms of her employment violated North Carolina public policy in that it was motivated both by her race and her sex"; and "[f]inally... a claim for negligent retention and supervision under North Carolina law."
 
 
 5
 While Mrs. McLean was employed at Patten, she, and at least some of the other female employees, were subjected to all manner of propositions, indignities and insults based on race or sex, or both. While most of the incidents we refer to were the acts of Hodge, there were also others upon which, although relevant, we depend only in insignificant part here.
 
 
 6
 Because our decision is arrived at in an appeal from a summary judgment, the evidence which we recite is made up of statements, affidavits, depositions, and documents in the record which are not inherently incredible and which we credit for the purposes of this decision.
 
 
 7
 According to a female employee at Patten, after Mrs. McLean left, Hodge joked about wanting to have sex with a black woman. As time went on, the female employees were called bitches, whores, sluts, brats, etc. The black employees were referred to as niggers. (J.A. 522-24).
 
 
 8
 After Mrs. McLean and other black employees had complained about Hodge's conduct, Hodge told another female employee he wanted Mrs. McLean fired, and he meant immediately. He then told that employee to make it hard on her [Kym] so she would quit. He thought that should she be fired, then she would sue the company for discrimination. He made that employee "stay on Kym about ... work performance and wanted her to be overworked so she would quit." Soon after Mrs. McLean left, Hodge started interviewing. When told by a female employee that four women were waiting to be interviewed, including two other black women, he told that employee to "send those Goddam niggers out of here," that he wasn't hiring any more of them. (J.A. 524).
 
 
 9
 When talking to Mitch Barron relating to the employee whom he had hired following Mrs. McLean's leaving, Hodge told him it would be hard for them [Mitch and Chet] to get anything done because "they've been too busy flirting with the two new women." He also told them that "they would have to wait their turn, that he [Hodge] would get into their pants before they [Mitch and Chet] would." (J.A. 523-24).
 
 
 10
 A female employee walked in on conversations Hodge was having with two other female employees, where "he seemed to be trying to get them to sleep with him for more money, the way he would me for so long." "It got to the point where [Hodge] didn't care who was around, he would say things to us about sexual intercourse, oral sex, multiple partners, his marital sex life.... On one occasion he told us how he'd like to tie us up all at one time and put bags over our heads and f* * * us until we couldn't take anymore. He thought this was humorous, however we were insulted." (J.A. 524).
 
 
 11
 Hodge told "the sales agents that he was going to fire [one female employee] because I was not doing my job and he thought I was a spoiled little bitch driving around in a $30,000 car. But he continued to tell me that if I `f* * *ed him' I'd be there until the end and no one would ever find out. I told him he was crazy." (J.A. 524). Hodge told another female employee, on more than one occasion, that he had a "big dick like brothers." (J.A. 353-54).
 
 
 12
 Speaking to one female employee of another female employee, Hodge also said that he would like to put a bottle up her and spin her on it. (J.A. 356).
 
 
 13
 Speaking of another female employee, Hodge told Mrs. McLean that he would like to "put his penis between her breasts and to screw her or f* * * her in that manner." (J.A. 291).
 
 
 14
 Referring to another female employee, Hodge said that "he'd turn her from being a dike to being a real woman." He would "show her what a real man could do for her." (J.A. 367).
 
 
 15
 Speaking to another female employee, he said, "[T]he wife is out of town. Honey, how about coming on by?" (J.A. 373).
 
 
 16
 Speaking of another female employee, he said that he would like to "ride her like a horse or a bull." (J.A. 365).
 
 
 17
 Hodge, referring to himself, told Mrs. McLean that she "should sleep with an old white man." (J.A. 284).
 
 
 18
 When asked by Mrs. McLean how he liked his coffee, he replied, "Hot and black like I like my women." (J.A. 272). That same remark was made for Mrs. McLean's benefit by Hodge in a conversation with a contractor. (J.A. 274).
 
 
 19
 Hodge propositioned Mrs. McLean by comparison to a black model with whom he had sexual relations while he was working for Vidal Sassoon. The implication was "what I could do for you" and "would you like to be with me." (J.A. 278).
 
 
 20
 There is evidence that an advertisement was placed for a replacement for Mrs. McLean prior to the time she was either fired or had resigned. (J.A. 444; Supp.1 doc. 36, p.12).
 
 
 21
 When Mrs. McLean and another female employee were out of the office with Hodge to purchase office furniture, Hodge repeatedly asked the other employee to stop at a hotel while they were out "so that she could do him, which meant to give him head," which meant Hodge solicited the other employee to engage in oral sex. (J.A. 319).
 
 
 22
 Hodge told another female employee that "he was glad that he had finally gotten rid of all the Niggers in the office." (J.A. 529).
 
 
 23
 Hodge told a female employee on several occasions that another male supervisory employee desired her and that she "could probably get just about anything that I wanted if I would parade around naked in front of him." (J.A. 529).
 
 
 24
 There was evidence that Mrs. McLean and other female employees had complained to people in management about the conduct of Hodge with reference to black and female employees. Hodge's employment was terminated December 31, 1995.
 
 
 25
 Mrs. McLean rejected every solicitation of Hodge to respond to his sexual advances and complained about his conduct to supervisory employees. At which time, in the words of the district court: "Hodge not only cooled toward her, but affirmatively undertook to make her employment so difficult and uncomfortable that she would resign." (J.A. 561).
 
 II.
 
 26
 Mrs. McLean filed her complaint in the district court. The complaint alleged that: 1) she was discriminated against because of her race under 42 U.S.C. § 1981; 2) she was discharged on the basis of race and sex, in violation of North Carolina's public policy against discrimination in employment; and 3) defendants negligently retained or supervised Hodge, and Barron and Shires, other supervisors.
 
 
 27
 Defendants moved for summary judgment. They asserted that McLean resigned and could not identify who fired her, thus they argued her race and sex discrimination claims must fail. They additionally argued that her negligent retention claim must fail because she failed to allege a cognizable tort, she was not injured, and the defendants did not know or have reason to know of Hodge's unfitness. McLean responded and reasserted her claims under 42 U.S.C. § 1981, North Carolina public policy, and for negligent retention.
 
 
 28
 The district court found that McLean's § 1981 claim failed because an at-will employment relationship cannot support a cognizable claim under § 1981. The district court additionally held that there was no wrongful discharge cause of action under North Carolina law for race or sex discrimination. Finally, the court rejected McLean's negligent retention and supervision claims because claims of sexual harassment and retaliation, on which such claims had to be based, were not actionable at common law and therefore could not form the basis of a negligent retention or supervision claim.
 
 III.
 
 29
 We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment de novo. See United States v. Kanasco, Ltd., 123 F.3d 209, 210 (4th Cir.1997). The moving party must demonstrate the absence of an essential element of the nonmoving party's case and that it is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges its burden by showing that there is an absence of evidence to support the nonmoving party's case, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We consider the facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. See Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505.
 
 IV.
 
 30
 Initially, we address Mrs. McLean's argument that the case law relied upon by the district court, which held that an at-will employee may not proceed under a § 1981[2] theory of liability, was rejected by this Court in Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir. 1999). Because Spriggs in this court was not available to the district court and reversed Spriggs v. Diamond Auto Glass, No. S 97-1449, 1997 WL 880756 (D.Md. Oct. 15, 1997), we remand to the district court for further proceedings. We declined to follow Hawkins v. Pepsico, Inc., 10 F.Supp.2d 548 (M.D.N.C.1998) held in Spriggs, see 165 F.3d at 1015, n. 7, that at-will employment in Maryland can be contractual. We stated, "[h]aving concluded that an at-will employment relationship is contractual, we hold that such relationships may therefore serve as predicate contracts for § 1981 claims." See Spriggs, 165 F.3d at 1018-19. North Carolina courts have also recognized that at-will employment relationships are contractual. See Evans v. Cowan, 132 N.C.App. 1, 510 S.E.2d 170, 174 (1999) ("This jurisdiction has long adhered to the employment-at-will doctrine, i.e., `[w]here a contract of employment does not fix a definite term, it is terminable at the will of either party, with or without cause.'" (citations omitted)). Because the district court's decision is contrary to our subsequent decision in Spriggs, we remand this aspect of the case for further proceedings consistent with Spriggs.
 
 V.
 
 31
 The district court, as noted, also entered judgment for the defendants on the claim of negligent retention or supervision. As the district court pointed out, such a claim had to be based on harassment or retaliation on account of race or sex, neither harassment or retaliation being common law torts in North Carolina. In Smith v. First Union Nat. Bank, 202 F.3d 234 (4th Cir.2000), we held that there was no private cause of action under North Carolina law for sexual harassment under § 143-422.2. 202 F.3d at 247. We stated that we agreed with the statement of the district court in Mullis v. Mechanics & Farmers Bank, 994 F.Supp 680 (M.D.N.C. 1997), that absent a clear indication from the North Carolina courts or legislature "it would be inappropriate for a federal court to create a private right of action under [§ 143-422.2]." Smith, 202 F.3d at 247. There is no reason to treat retaliation any differently than we have treated sexual harassment, and in this case, we arrive at the same conclusion, and hold that there is no private right of action under North Carolina law for retaliation under § 143-422.2. Accordingly, summary judgment in favor of the defendants on account of negligent retention or supervision is affirmed.
 
 VI.
 A.
 
 32
 We next address whether North Carolina law recognizes a cause of action for wrongful discharge where an employee is fired for refusing to consent to the sexual advances of the employer. McLean has stated that she is not asserting a state law claim for sexual harassment, rather, the actions of her employer constitute sex and race discrimination as defined under the public policy of exception of North Carolina expressed in Section 143-422.2. She argues that the district court erred as a matter of law when it held that wrongful discharge on the basis of race or sex is not forbidden by the public policy of North Carolina.
 
 Section 143-422.2 states:
 
 33
 It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.
 
 
 34
 It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.
 
 
 35
 N.C. Gen.Stat. § 143-422.2.
 
 
 36
 While there have been numerous cases in the lower courts discussing whether a private cause of action can be maintained under Section 143-422.2 for allegations relating to discrimination based on race or sex, we have held in Hughes and cited in Smith that this statute does apply "to common law wrongful discharge claims or in connection with other specific statutory remedies." Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir.2000); Hughes v. Bedsole, 48 F.3d 1376, 1383 and n. 6 (4th Cir.1995). Thus, the question here is whether a plaintiff who has claimed that her discharge was because she would not accede to the sexual advances of her supervisor has stated a cause of action. In two cases we answered this question in the affirmative. Owen v. Carpenters' Dist. Council, 161 F.3d 767, 774 (4th Cir.1998); Harrison v. Edison Bros. Apparel Stores, Inc., 924 F.2d 530 (4th Cir.1991). In both Owen and Harrison, the court was faced with facts indistinguishable from those present here and concluded that the plaintiffs stated wrongful discharge causes of action under state law for refusing the sexual advances of their supervisors.[3]
 
 
 37
 In Harrison, a female employee brought a wrongful discharge claim under North Carolina common law alleging that she had been fired after she refused to have sex with her supervisor. Harrison, 924 F.2d at 531, 532. The district court held that North Carolina would not recognize such a wrongful discharge claim under the public policy exception of North Carolina law. Harrison, 924 F.2d at 533. We reversed the district court, holding that the employee had indeed stated a cause of action under the facts alleged. Harrison, 924 F.2d at 533-34. In coming to this conclusion, we also held that while North Carolina may require that the discharge violate public policy, it may not also require that there be no remedy available to protect the interest of the aggrieved employee or society because "the courts of North Carolina cannot fail to provide a forum to determine a valid cause of action." Harrison, 924 F.2d at 533 (citation omitted).
 
 
 38
 We came to a similar conclusion in Owen, a case involving the same facts, but on this occasion under Maryland law. A female employee filed a wrongful discharge claim under the Maryland public policy exception, similar in its application and content to § 143-422.2,[4] alleging that she was discharged because she rebuffed her supervisor's sexual advances. Owen, 161 F.3d at 770. We held that a plaintiff states a wrongful discharge cause of action "where an employee, like Owen, is discharged because the employee rebuffed the sexual advances of her supervisor...." Owen, 161 F.3d at 774. When an employee is discharged because she has refused to accede to the sexual advances of a supervisor, we are of opinion and hold that the discharge was due to "discrimination or abridgement on account of ... sex" in the "terms of employment" in violation of the public policy of North Carolina under § 143-422.2. This decision follows our decision in Harrison, 924 F.2d at 534. Accordingly, we find the plaintiff has stated a cause of action for wrongful discharge on account of discrimination or abridgement because of sex and vacate the decision of the district court in that respect.
 
 B.
 
 39
 Just as we have held and hold in this case that a North Carolina state cause of action for wrongful discharge is stated by a claim that an employee is separated from employment because of her sex when the cause of separation is her refusal of sexual favors to her supervisor, then, when the record indicates, as it does in this case, that her separation may have been caused because of her race, we are of opinion and hold that she has stated a cause of action under the state law of North Carolina under § 143-422.2.
 
 
 40
 Accordingly, the judgment of the district court is affirmed in part, and vacated in part, and the case is remanded for consideration of the claims of the plaintiff for wrongful discharge on account of sex or race, either or both, under § 143-422.2. Upon remand, the court should also consider the cause of action claimed under 42 U.S.C. § 1981.
 
 
 41
 
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS
 
 
 
 
 Notes:
 
 
 [1]
 Carolina Hills is a subdivision owned by Patten Communities, Inc., Patten Corporation, Bluegreen Communities, Inc., and Bluegreen Corporation. Collectively, these entities will be referred to as Defendant(s)
 
 
 [2]
 Section 1981(a) guarantees equal rights to make and enforce contracts, which means "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b)
 
 
 [3]
 InHarrison, the employee's separation of employment occurred in December, 1986. § 143-422.2 of the North Carolina statute was enacted in 1987. That case was decided on a public policy exception similar to § 143-422.2.
 
 
 [4]
 The Maryland public policy exception makes it unlawful, inter alia, for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's... sex...." Md. Ann.Code art. 49B, § 16(a)(1)
 
 
 
 42
 TRAXLER, Circuit Judge, concurring and dissenting:
 
 
 43
 I concur in the result reached in part IV of the opinion as to McLean's section 1981 claims, and I also concur in the result reached in part VI as to McLean's wrongful discharge claims. However, I believe that the district court improperly granted summary judgment against McLean's claim of negligent retention and supervision. Accordingly, I respectfully dissent from part V of the majority opinion.
 
 
 44
 "To support a claim of negligent retention and supervision against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Smith v. Privette, 128 N.C.App. 490, 495 S.E.2d 395, 398 (1998) (internal quotation marks omitted). The district court concluded that the underlying tort must be a common-law tort, rather than a tort based on a violation of a statutory duty. No North Carolina state court, however, has articulated such a requirement, and I can see no reason why North Carolina would believe it proper to hold an employer responsible for retaining an employee who committed a common-law tort but not for retaining an employee who committed a statutory tort. McLean's evidence, if accepted by the jury, would certainly indicate that Hodge violated Title VII, which should be sufficient to support the negligent retention claim.
 
 
 45
 Moreover, even if the underlying tort must be a common-law tort, workplace actions that amount to sexual or racial harassment can and frequently do constitute common-law torts. See Smith, 495 S.E.2d at 398 (concluding that the First Amendment did not preclude prosecution of negligent retention claim against a church by church employees based upon the "sexual misconduct" of the minister); Brown v. Burlington Indus., Inc., 93 N.C.App. 431, 378 S.E.2d 232 (1989) (affirming jury's determination that co-worker's pattern of sexual harassment amounted to intentional infliction of emotional distress, which provided the basis for a verdict against the employer on a negligent retention claim); cf. Bryant v. Thalhimer Bros., Inc., 113 N.C.App. 1, 437 S.E.2d 519 (1993) (concluding that evidence of sexual harassment by a supervisor supported verdict in favor of the plaintiff on a claim of intentional infliction of emotional distress). I believe that a jury could reasonably conclude from McLean's evidence that Hodge committed various torts, such as battery or negligent infliction of emotional distress. Accordingly, even if North Carolina law requires the commission of a common-law tort as the predicate for a negligent retention claim, McLean's evidence is sufficient to survive summary judgment. I therefore dissent from the majority's conclusion that the district court properly granted summary judgment on McLean's negligent retention claim.