PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GARY W. JEFFREYS; LARRY S. CRAIG;
RICHARD L. LEE; JERRY L. HALL, JR.;
JAMES R. PECKINPAUGH; KARLA D.
UMBERGER; ERIC J. LEWIS; JAMES E.
VIDA; JERRY D. WATKINS; WILLIAM
T. STARKS; KENNETH W. JANNETT;
VILENA HUTCHINSON, formerly
known as Vilena Broerman; JAYNE
M. JOHNSON; VINCENT J. CACCAVO;
MARGIE B. COOK; DAVID R.
SANCHEZ,
           *Plaintiffs-Appellants,*

              v.                                    No. 03-1378

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,
           *Defendant-Appellee,*

              and

US AIRWAYS, INCORPORATED,
Suggestion of Bankruptcy filed
8/16/02,
           *Defendant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-02-995-A)

Argued: October 30, 2003

Decided: December 31, 2003

Before WILKINSON and TRAXLER, Circuit Judges, and Robert E. PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Traxler and Judge Payne joined.

---

## COUNSEL

**ARGUED:** William Beverly Poff, WOODS, ROGERS & HAZLE-GROVE, P.L.C., Roanoke, Virginia, for Appellants. Daniel M. Katz, KATZ & RANZMAN, P.C., Washington, D.C., for Appellee. **ON BRIEF:** Francis H. Casola, Frank K. Friedman, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellants. Louise P. Zanar, KATZ & RANZMAN, P.C., Washington, D.C., for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

In the wake of September 11, US Airways, Inc. ("USAir") was forced by financial distress to close many of its smaller stations and furlough thousands of employees. The union representing the affected employees, the Communication Workers of America, objected to the airline's planned furlough system, and it persuaded USAir to institute the furloughs according to a different method. Plaintiff Gary W. Jeffreys was one of fifteen USAir employees laid off or reassigned under the airline's modified furlough system. Jeffreys and the other employees claimed that the Communication Workers of America did not fairly represent them when it urged the airline to change its displacement practices. Because the district court properly found that the union's conduct was neither arbitrary nor discriminatory nor in bad faith, we affirm its judgment that the union did not breach its duty of fair representation to workers like Jeffreys.

## I.

The district court granted summary judgment to the CWA, and we therefore view the facts in the light most favorable to Jeffreys. *See, e.g.*, *McLean v. Patten Communities, Inc.*, 332 F.3d 714, 719 (4th Cir. 2003). In August 1999, as a result of an employee election, the CWA became the certified bargaining representative for the passenger service employees of USAir. Shortly thereafter, the CWA and USAir negotiated a collective bargaining agreement to govern the passenger service employees. Article 12, Section C.2.b is the only provision of the collective bargaining agreement at issue in the present case. It provides that, should USAir reduce its workforce, targeted full-time employees will "be permitted, if there are insufficient full-time positions within the classification, to displace, in seniority order, the most junior full-time employees in the classification on the system."

The meaning of Article 12, Section C first came into question in the aftermath of the September 11, 2001 terrorist attacks, when USAir decided to furlough approximately 2,700 passenger service employees. As a part of USAir's reorganization, the airline closed operations at ten small-station locations like Huntsville, Alabama; Columbia, South Carolina; and Roanoke, Virginia. Plaintiffs are all former long-time passenger service employees of USAir who worked at these locations and who were terminated or reassigned as a result of USAir's furloughs. As passenger service employees, Jeffreys and the other plaintiffs were all members of the CWA at the time of USAir's reorganization.

When USAir announced its job cutbacks, it proceeded according to the system that it had used prior to the 1999 collective bargaining agreement. The airline began by offering the displaced employees an opportunity to bid for jobs held by more junior employees at other airports. USAir determined how many displaced employees wished to bid for jobs at other locations, and then it prepared a "juniority" list of employees subject to being "bumped." For example, in the present case, if all 2,700 displaced employees desired jobs elsewhere with USAir (and they were all relatively senior workers), then USAir's 2,700 newest employees would have been subject to being bumped.

In addition to creating the juniority list, USAir sent furlough and displacement packages to potentially affected employees that allowed

them to bid on any of USAir's other locations. The displacement bid forms were distributed not only to senior workers at closed stations like Huntsville and Roanoke, but also to junior employees in other cities like Charlotte and Philadelphia who were on the juniority list and thus subject to being bumped. In this way, just as a Huntsville employee with several years' seniority might bump a Charlotte employee on the juniority list, so too could the Charlotte employee bump an even more junior agent on the list. USAir's system permitted unlimited "ricochet" or secondary bumping within those employees on the juniority list.

USAir processed the bids using this system of sequential bumping on Saturday, October 6, 2001. One of the CWA's local union presidents observed without objection the company's processing of the displacement bids, and USAir announced the results on the following Monday, October 8. Because the plaintiffs had considerable seniority (ranging from 16 to 31 years), they had bid on locations of their choice at which they knew more junior employees were working. Based on their seniority, Jeffreys and the other plaintiffs received their first choices of job assignments. However, on Tuesday, October 9, the day after USAir had announced the bid results, James Root, President of CWA Local 3641 in Charlotte, North Carolina, submitted a formal Grievance challenging the method by which USAir had reassigned its employees.

According to the Grievance, the 1999 collective bargaining agreement was not meant to codify the airline's prior displacement practices; rather, it was intended to establish a new system of displacement. Specifically, Article 12, Section C did not permit senior employees to displace *any* more junior employee. Rather, the provision permitted senior employees to displace only "*the most junior full-time employees*" elsewhere in the airline. In short, the Grievance claimed, there was to be no "ricochet" bumping: the most senior employee to be furloughed had to bid on the location where the most junior employee was working in order to be successful. This process, continued in order of seniority, would result in one-for-one, rather than sequential, displacements.

The Grievance generated much consternation. Plaintiffs objected that the Grievance's interpretation ignored Article 12, Section C's use

of the plural "employees." A system of one-for-one displacements, as the Grievance envisioned, would allow a senior employee to displace only the singlemost junior employee, and not more junior "employees," as the text of Article 12, Section C states. In addition, according to Jeffreys and the other plaintiffs, Root's Grievance was merely a self-serving attempt to protect Charlotte-based USAir workers. Charlotte is one of USAir's hubs and largest locations, and once the bid results were announced on October 8, it became clear that senior employees from the ten closed stations had displaced roughly fifty-five junior employees in Charlotte. For instance, Jeffreys, who had thirty-one years' seniority, was awarded his bid to work in Charlotte.

The Grievance occasioned quick action from the union's leadership. Rick Braswell, Assistant to the President of the CWA and chief CWA spokesperson during negotiations over the collective bargaining agreement, held a conference call on October 10 with Presidents of the CWA Local Unions and key CWA staff members. The group concluded that USAir's bid results conflicted with the CWA's understanding of the collective bargaining agreement, and thus that the Grievance was meritorious. USAir soon agreed to settle the Grievance, but the airline refused to slow down its reorganization by delaying the implementation of furloughs or sending out new bid packages. Instead, the employees' original displacement bid forms were to be reprocessed under the method articulated in the Grievance. The CWA Local Union Presidents and the CWA staff discussed the proposed settlement in two more conference calls on Thursday, October 11, and the CWA and USAir executed the settlement agreement later that day.

The new system changed USAir's initial job awards. Under the initial awards, all fifteen of the plaintiffs received their preferred assignments, with eleven of them displacing employees in Charlotte. However, once the bids were reprocessed under the new system, the plaintiffs were either furloughed or reassigned to less desirable stations. Eleven of the plaintiffs were furloughed, because they had bid only choice locations like Charlotte. Charlotte's workers, although they had less seniority than the plaintiffs, still had more seniority than USAir employees in less popular locations. In other words, the Charlotte workers were not the "most junior" USAir employees, and so they were no longer eligible to be bumped by the plaintiffs. The four plaintiffs who had bid on less preferred locations received assign-

ments in Philadelphia. Thus the net effect of the Grievance was to reduce the total number of displacements system-wide, but to do so by replacing very junior employees with very senior employees while leaving in place those employees with mid-range seniority.

The plaintiffs sought damages and injunctive relief, alleging that the CWA had breached its duty of fair representation in urging USAir to alter its initial job awards. After allowing discovery and certifying the class of employees disadvantaged by USAir's revised bidding process, the district court granted the CWA's motion for summary judgment and dismissed the plaintiffs' claims against the union. The district court ruled that, as a matter of law, the CWA's conduct had been neither arbitrary nor discriminatory nor in bad faith, and that therefore the CWA had not breached its duty of fair representation to any of its members. Jeffreys and the other plaintiffs now appeal.

## II.

During its settlement of the Grievance, the CWA had a duty to represent the interests of all of its employees "fairly, impartially, and in good faith." *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 204 (1944). The CWA breached its duty of fair representation if its conduct toward any of its members was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). Whether the CWA acted arbitrarily, discriminatorily, or in bad faith involves distinct and separate inquiries that we undertake in turn. *See Thompson v. Aluminum Co. of America*, 276 F.3d 651, 657 (4th Cir. 2002); *Griffin v. Int'l Union*, 469 F.2d 181, 183 (4th Cir. 1972).

## A.

From our review of the record, the plaintiffs have not offered any evidence to suggest that the CWA's conduct in adopting and settling the Grievance was arbitrary. The CWA's decision to press the Grievance was arbitrary only if it was "so far outside a wide range of reasonableness, that it [was] wholly irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991) (internal quotations omitted). The plaintiffs must establish then that the CWA's interpretation of Article 12, Section C was without any "rational basis or explanation."

*Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998). This is a high bar that plaintiffs simply cannot satisfy.

In essence, the CWA faced two plausible interpretations, each consistent with the language of the collective bargaining agreement, and each possessed of distinct advantages and disadvantages. On the one hand, the plaintiffs' interpretation focused on Article 12, Section C's use of the plural "employees." Plaintiffs argued that senior employees should be able to replace some set of more junior employees, and not simply the most junior employee anywhere in the entire airline. The plaintiffs' interpretation accorded displaced senior employees a wider range of options, repaying them for their extra years of service with USAir. At the same time, however, the plaintiffs' interpretation maximized the disruptiveness of reductions in force: displaced employees would bump more junior employees, who in turn would bump even more junior employees. Thus even a single displacement would have cascade effects at many different USAir locations.

On the other hand, the Grievance's interpretation focused on Article 12, Section C's use of the entire phrase "the most junior employees." According to the Grievance, the most senior displaced employee needed to replace "the most junior" employee at the airline with the same job. Under plaintiffs' system of sequential or ricochet bumping, however, displaced employees would not be replacing "the most junior" workers in the system. For instance, in the present case many of the newest USAir employees were stationed in Philadelphia — yet these were precisely the workers whom the plaintiffs did not want to replace, because the plaintiffs preferred other locations like Charlotte to Philadelphia.

It is true that the Grievance's interpretation ensured more limited seniority rights, because long-time employees, like Jeffreys, would be sent to less desirable USAir locations. However, the Grievance's interpretation offered greater stability to USAir employees as a group by minimizing the number of employees adversely affected during times of financial crisis. In fact, there is evidence in the record that suggests over a hundred fewer employees were furloughed, relocated, or reduced from full to part-time as a result of the Grievance settlement.

In endorsing the Grievance, the union imposed regrettable hardships on the plaintiffs, especially since USAir insisted that bids be processed without the opportunity for rebidding. But whether or not the CWA's decision to adopt the Grievance's interpretation was the wisest or fairest one, it was clearly not arbitrary. Rather, the CWA made an "informed, reasoned judgment regarding the merits of the [Grievance] in light of the language contained in the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 127 (2nd Cir. 1998). Seniority is important to the lives and well-being of workers and to the entire fabric of labor-management relations. Yet stability is likewise meaningful to employees and their families. In the face of these competing concerns, the CWA construed Article 12, Section C to permit only one-for-one rather than sequential bumping, in an attempt to respect employees' seniority while also lessening the furloughs' overall disruptiveness.

In short, the CWA, which bears the primary responsibility for construing the collective bargaining agreement, weighed the values of seniority and stability, and reached a considered judgment to which we must be "highly deferential." *O'Neill*, 499 U.S. at 78; *see also Marquez*, 525 U.S. at 45-46; *Garrison v. Cassens Transport Co.*, 334 F.3d 528, 538-39 (6th Cir. 2003); *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992). The CWA was elected by USAir's passenger service employees to represent their interests, and when the employees' interests conflicted, the CWA was permitted "a wide range of reasonableness" within which to strike a balance. *O'Neill*, 499 U.S. at 78. We cannot say that it struck an arbitrary or irrational one.

B.

Plaintiffs have similarly failed to create a genuine issue as to whether the CWA acted discriminatorily or in bad faith. While the arbitrariness of the CWA's actions turns on the objective adequacy of the union's conduct, whether the CWA acted discriminatorily or in bad faith depends on the subjective motivation of the union's officials. *See Thompson*, 276 F.3d at 658 (citing *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir. 1997)). As the district court found, there is no evidence in the record indicating that the CWA's leadership — or the local union presidents who voted to

approve the Grievance — were motivated by animosity or personal hostility toward the plaintiffs.

The CWA found itself in a difficult position. However the union read Article 12, Section C, it was bound to ignore the wishes of some set of workers, be it senior employees in the ten closed locations or more junior employees in numerous other locations. But the fact that its decision disappointed some of its workers does not mean in itself that the CWA failed to fairly represent any of its members. The duty of fair representation prohibits only "invidious" discrimination, such as discrimination based on constitutionally protected categories like race or gender, or discrimination that arises from animus or prejudice. *O'Neill*, 499 U.S. at 81; *see also Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1359-60 (10th Cir. 1994).

Again, there is simply no evidence in the record to suggest that the CWA acted from ill or impure motives. The CWA was required to adopt an contractual interpretation that would necessarily favor some workers over others. "That it did so — in a manner which, on its face, seems reasonable and in conformity with controlling agreements — does not, by itself, show invidious discrimination of the kind prohibited by the duty of fair representation." *Chaparro-Febus v. Int'l Longshoremen Ass'n, Local 1575*, 983 F.2d 325, 330-31 (1st Cir. 1992) (internal quotations omitted).

Likewise, the plaintiffs have failed to demonstrate that the CWA acted in bad faith. Plaintiffs' allegations of bad faith rest on the fact that a CWA local union president, Pam Terry, observed without objection USAir's processing of the displacement bids. According to the plaintiffs, the CWA thus tacitly approved USAir's original method, and only later protested in order to appease Charlotte-based constituents. However, nothing in the record suggests that Terry was present during the bid processing for any other reason than to ensure that the employees' bids were not mishandled. Once the results were announced, the CWA's members immediately objected to USAir's furlough system, and the local union presidents, of whom Terry was one, voted overwhelmingly to support the Grievance.

Nor is there any evidence to suggest that the union's executives and the local union presidents engaged in "fraud, or deceitful or dis-

honest action." *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1470 (10th Cir. 1993); *see also Thomson v. Verizon Maryland, Inc.*, 140 F.Supp.2d 546, 551 (D. Md. 2001). The union put the matter to its local leaders, who themselves represented the full range of USAir locations, including the smaller markets in which the plaintiffs worked. The plaintiffs appear simply to disagree with the results of the union's democratic process. But we are not empowered to substitute our judgment for that of the CWA's leaders, whatever we may think of their decision. *See, e.g.*, *Dement v. Richmond, Fredericksburg & Potomac R.R. Co.*, 845 F.2d 451, 459 (4th Cir. 1988).

III.

In the interpretation of collective bargaining agreements, no less than in their negotiation, "[i]t is inevitable . . . that some employees will fare worse than others." *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 724 F.2d 406, 412 (4th Cir. 1983); *see also Smith v. Local 7898, United Steelworkers of America*, 834 F.2d 93, 96 (4th Cir. 1987) ("Disputes over seniority invariably mean that, in the end, one's gain is another's loss."). But a union like the CWA still may adopt interpretations that "achieve long term advantages, even though individual employees may be affected differently" as a result. *Sutton*, 724 F.2d at 412; *see also Humphrey v. Moore*, 375 U.S. 335, 349-50 (1964). At day's end, the CWA reached a deliberate and democratic decision that was consistent with the contractual language and with the views of a majority of its members.

We do not reach this conclusion without being mindful of the unfortunate circumstances in which the plaintiffs find themselves. There can be no question that the union's decision severely impacted them. Several of the plaintiffs endured the trauma of losing their jobs after years of faithful service to USAir. However, the anguish caused by USAir's furloughs and relocations ultimately was occasioned not by management or unions acting in bad faith, but by the tragic events of September 11 and their fallout on the airline industry. It would be wrong for courts to lay the blame for these larger events at the feet of the CWA or its leadership, in the face of evidence that the CWA, like everyone else, searched for reasonable measures amidst difficult and trying times.

The judgment of the district court is hereby

*AFFIRMED.*